CEDE & CO. and Cinerama, Inc., Petitioners Below, Appellants/Cross–Appellees,

v.

**TECHNICOLOR, INC.,** Respondent Below, Appellee/Cross–Appellant.

**CINERAMA, INC.,** a New York corporation, Plaintiff Below, Appellant/Cross–Appellee,

v.

**TECHNICOLOR, INC.,** a Delaware corporation, Morton Kamerman, Arthur N. Ryan, Fred R. Sullivan, Guy M. Bjorkman, George Lewis, Jonathan T. Isham, MacAndrews & Forbes Group, Incorporated, a Delaware corporation, Macanfor Corporation, and Ronald O. Perelman, Defendants Below.

Supreme Court of Delaware.

Submitted: June 22, 1992.

Decided: Oct. 22, 1993.

Revised: Nov. 1, 1993.

Upon Return to Remand for Clarification Jan. 18, 1994.

Gary J. Greenberg (argued), and Sylvia L. Shapiro, New York City, Peter M. Sieglaff, Robert K. Payson and Arthur L. Dent of Potter, Anderson & Corroon, Wilmington, for petitioners/plaintiff-appellants and cross-appellees Cinerama, Inc. and Cede & Co.

Rodman Ward, Jr. and Thomas J. Allingham II (argued), John G. Day, R. Michael Lindsey, David J. Margules, Mary M. MaloneyHuss, Robert M. Omrod and Jeff A. Shumway of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for respondent-appellee and cross-appellant Technicolor, Inc., in C.A. No. 7129, and defendants-appellees and cross-appellants MacAndrews & Forbes Group, Inc., Macanfor Corp. and Ronald O. Perelman in C.A. No. 8358.

Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, for defendants-appellees and cross-appellants Technicolor, Inc., Morton Kamerman, Arthur N. Ryan, Fred R. Sullivan, Guy M. Bjorkman, George Lewis and Jonathan T. Isham in C.A. No. 8358.

Before HORSEY, MOORE and HOLLAND, JJ.

HORSEY, Justice:

# I.

## Nature of Case

## Prior Proceedings

## Summary of Principal Holdings

This appeal from final judgment of the Court of Chancery encompasses consolidated suits: a first-filed Delaware statutory appraisal proceeding (the "appraisal action"), and a later-filed shareholders' individual suit for rescissory damages for "fraud" and unfair dealing (the "personal liability action") brought by plaintiffs, Cinerama, Inc. ("Cinerama"), a New York corporation, and Cede & Co. ("Cede"), the owner of record. The actions stem from a 1982–83 cash-out merger in which Technicolor, Incorporated ("Technicolor"), a Delaware corporation, was acquired by MacAndrews & Forbes Group, Incorporated ("MAF"), a Delaware corporation, through a merger with Macanfor Corporation ("Macanfor"), a wholly-owned subsidiary of MAF.[1] Under the terms of the tender offer and later cash-out merger, each shareholder of Technicolor (excluding MAF and its subsidiaries) was offered $23 cash per share.

Plaintiff Cinerama was at all times the owner of 201,200 shares of the common stock of Technicolor, representing 4.405 percent of the total shares outstanding. Cinerama did not tender its stock in the first leg of the MAF acquisition commencing November 4, 1982; and Cinerama dissented from the second stage merger, which was completed on January 24, 1983. After dissenting, Cinerama, in March 1983, petitioned the Court of Chancery for appraisal of its shares pursuant to 8 *Del.C.* § 262. In pretrial discovery during the appraisal proceedings, Cinerama obtained testimony leading it to believe that director misconduct had occurred in the sale of the company. In January 1986, Cinerama filed a second suit in the Court of Chancery

1. Hereafter we refer to MAF and Macanfor, also a Delaware corporation, collectively as "MAF."

against Technicolor, seven of the nine members of the Technicolor board at the time of the merger, MAF, Macanfor and Ronald O. Perelman ("Perelman"), MAF's Chairman and controlling shareholder. Cinerama's personal liability action encompassed claims for fraud, breach of fiduciary duty and unfair dealing, and included a claim for rescissory damages, among other relief. Cinerama also claimed that the merger was void *ab initio* for lack of unanimous director approval of repeal of a supermajority provision of Technicolor's charter.

The defendants in the personal liability action moved to dismiss the action, arguing that Cinerama had no standing to pursue such a claim after petitioning for appraisal of its shares. The Chancellor denied the motion but ruled that after discovery was completed, Cinerama would have to elect which cause of action it wished to pursue. Cinerama filed an interlocutory appeal to this Court and we reversed. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 542 A.2d 1182 (1988) ("*Cede I* "). In *Cede I* this Court found the Chancellor to have committed legal error in requiring plaintiff to make an election of remedies before trial. We held that the plaintiff shareholder was entitled to pursue concurrently, through trial, its appraisal action and its personal liability action. We then remanded the case for trial of the consolidated appraisal and personal liability actions.

Following an extended trial and after further discovery, the Chancellor elected to decide first the appraisal suit. The court did so notwithstanding this Court's implicit instruction in *Cede I*. 542 A.2d at 1189, 1191.[2] By unreported decision (the "Appraisal Opinion") dated October 19, 1990, the Chancellor found the fair value of the dissenting shareholders' Technicolor stock to be $21.60 per share, as of January 24, 1983, the date of the merger. In June 1991, the court, in a second unreported decision (the "Personal Liability Opinion"), 1991 WL 111134, found pervasive and persuasive evidence of the defendant directors' breach of their fiduciary duties, but

concluded that Cinerama had not met its burden of proof. On that ground, the Chancellor entered judgment for the defendants. The court also found no merit in Cinerama's further claims: that the merger was void *ab initio;* that Technicolor's directors had breached their duty of disclosure in their 14D–9 filing and proxy statement; and that MAF and Perelman, on becoming controlling shareholders of Technicolor, breached fiduciary duties owed Cinerama entitling Cinerama to rescissory damages. Cinerama then appealed both decisions.

\* \* \*

Addressing the Personal Liability Opinion, we find no merit in Cinerama's direct claims for rescissory damages. We also find no error in the Chancellor's use of a materiality standard to define duty of loyalty. We find error in his reliance on a reasonable person analysis, but decline to resolve the loyalty issue on the present record. Neither the parties nor the trial court has addressed the relevance and legal effect of Technicolor's charter requirement of director unanimity (for sale of the company to be accomplished by less than ninety-five percent share vote on the merger) upon the trial court's presumed finding of the "material" disloyalty of directors Fred Sullivan and Arthur Ryan. The court has also not addressed the relevance and effect of the interested-director provisions of 8 *Del.C.* § 144 upon: (1) the business judgment rule's requirement of director loyalty; (2) Technicolor's charter requirement; and (3) Cinerama's claim for rescissory damages, assuming it prevails under an entire fairness standard of review of the merger.

We also conclude that the trial court has erred as a matter of law in reformulating the business judgment rule's elements for finding director breach of duty of care in the context of an arms-length, third-party transaction lacking evidence of director bad faith or director self-dealing. The Chancellor has erroneously imposed on Cinerama, for purposes of rebutting the rule, a burden of proof of

---

**2.** Therein we stated twice that if, in the consolidated proceedings, the court should determine that the merger "should not have occurred due to fraud, breach of fiduciary duty, or other wrongdoing on the part of the defendants, then Cinerama's appraisal action will be rendered moot and Cinerama will be entitled to receive rescissory damages." *Cede I*, 542 A.2d at 1191. *But see* sections IV and VI *infra*.

board lack of due care which is unprecedented. We refer to the Chancellor's holding that a shareholder plaintiff such as Cinerama must prove injury resulting from a *found* board breach of duty of care, to rebut the business judgment presumption. The court has also erred in ruling that the damages recoverable by a wrongfully cashed-out shareholder such as Cinerama for board breach of fiduciary duty are limited to the difference between the fair value of its Technicolor stock, as determined for statutory appraisal purposes as of the date of the merger, and the cash tender offered. Apart from the unresolved duty of loyalty issues, on the trial court's presumed findings of *board* breach of duty of care, we find the business judgment presumption accorded the Technicolor board action of October 29, 1982 to have been rebutted for board lack of due care. Therefore, we reverse and remand the personal liability action with instructions to the trial court to apply the entire fairness standard of review to the merger.

Our determination of the personal liability action renders moot Cinerama's appeal of the Appraisal Opinion and the issues raised therein. *See Cede I.*

## II. FACTS [3]

### A. Background

In 1970 Technicolor was a corporation with a long and prominent history in the film/audio-visual industries. Technicolor's core business for over thirty years had been the processing of film for Hollywood movies through facilities in the United States, England and Italy. In its field, Technicolor was the most prominent of a handful of compa-

nies. Notwithstanding Technicolor's dominance within its field, the company, by the late seventies, decreased in competitiveness. Its major film processing laboratory was, in the words of Morton Kamerman ("Kamerman"), its Chief Executive Officer and Board Chairman,[4] "totally out of control" and it was taking losses that were "unacceptable."

In response, Technicolor's Chief Executive Officer initiated efforts to reduce costs at Technicolor's film laboratories and to eliminate other inefficiencies. Through Kamerman's initiative, in the late seventies Technicolor's market share and earnings improved. However, by the early eighties, Technicolor's increase in market share had leveled off and the company's core business earnings had stagnated. Kamerman concluded that Technicolor's principal business, theatrical film processing, did not offer sufficient long-term growth for Technicolor, even though it still represented more than fifty percent of Technicolor's net income.

Kamerman proposed that Technicolor enter the field of rapid processing of consumer film by establishing a network of stores across the country offering one-hour development of film, with quality service at competitive prices. The business, named "One Hour Photo" ("OHP"), would require Technicolor to open approximately one thousand stores over the next five years and to invest about $150 million. In May 1981, Technicolor's Board of Directors approved Kamerman's plan. The following month Technicolor announced its ambitious venture with considerable fanfare. On the date of its OHP announcement, Technicolor's stock had risen to a high of $22.13.[5]

---

3. We borrow liberally from, and generally adopt, the Chancellor's findings.

4. Kamerman, previously Chief Executive Officer of a cosmetics company, had been elected to the board of Technicolor as a result of a proxy contest in 1970, and later became a vice-president. In 1976, Kamerman had become Chairman of the Board and Chief Executive Officer of Technicolor, and he continued to hold this position through the date of the merger in question. In 1982 Kamerman was also the second largest shareholder of Technicolor stock. The Court of Chancery characterized Kamerman as a "strong-willed" chairman.

5. Technicolor's stock was traded on the New York Stock Exchange on the NASDAQ index. To the consternation of management, the value of Technicolor stock fluctuated wildly during the late 1970's and early 1980's. During the late 1970's, Technicolor stock had traded in the $8 to $10 range. In 1980 and 1981, the price of the stock rose above $28 per share, and peaked at $28.50 per share in April 1981. The increase in the public market price of the stock coincided with a dramatic increase in the price of silver. The film processing technique employed by Technicolor utilized silver, which could be reclaimed and sold after the process was completed. With the silver market stabilizing in 1981, Technicolor's consolidated net income fell off. As earn-

The securities market reacted negatively to Technicolor's announcement. Technicolor's stock had dropped by almost $4 a share; and over the next month no Technicolor store had opened. The market had reacted to concern over the size of Technicolor's investment in the new venture, $150 million, in proportion to the shareholders' equity, $78 million.

In the months that followed, Technicolor fell behind on its schedule for OHP store openings and the relatively few stores that did open reported operating losses. At a time when Technicolor's film processing business was facing stiff competition and had lost one of its major film production clients to a competitor, OHP came to be viewed as a drain on Technicolor's resources. Technicolor's other major divisions were experiencing mixed if not disappointing results.

As of August 1982, Technicolor had opened only twenty-one of a planned fifty OHP retail stores; and its Board was anticipating a $5.2 million operating loss for OHP in fiscal 1983. Notwithstanding, Kamerman remained committed to OHP. In the company's Annual Report, issued September 7, 1982, Kamerman reported, "We remain optimistic that the One Hour Photo business represents a significant growth opportunity for the Company." In contrast, for the fiscal year ending June 1982, Technicolor's September financial statements reported an eighty percent decline of consolidated net income—from $17.073 million in fiscal 1981 to $3.445 million in 1982. Senior management of Technicolor attributed the decline not only to write-offs for losses in Technicolor's proposed sale of its Gold Key and Audio–Visual divisions, but to profit decline in Technicolor's core business, film processing. By September 1982, Technicolor's stock had reached a new low of $8.37 after falling by the end of June to $10.37 a share.

## B. Prelude to Negotiations

In the late summer of 1982, Perelman of MAF concluded that Technicolor would be an attractive candidate for takeover by MAF. MAF was a small company, roughly half the size of Technicolor; its market capitalization was forty percent that of Technicolor's, and its revenues were substantially less than Technicolor's. After several bids for other companies had been thwarted, Perelman targeted Technicolor for takeover. Perelman's interest in Technicolor was not then known to any of Technicolor's management.

Perelman was aware of the financial constraints imposed upon MAF by its lender banks. Perelman's lender banks had gone on record as being opposed to financing a hostile bid.[6] Perelman was also aware that Technicolor's certificate of incorporation contained a supermajority provision requiring a shareholder vote of ninety-five percent of the outstanding shares for approval of a merger. Advised of this constraint, Perelman, in early September, sought advice from his investment banker on "how to get his foot in Technicolor's door." *Personal Liability Opinion* at 10.

Perelman learned that Michael Tarnopol ("Tarnopol"), a Managing Director at Bear, Stearns & Co. ("Bear Stearns"), had a long-standing business relationship with Fred Sullivan ("Sullivan"), one of Technicolor's directors. Perelman apparently asked Tarnopol to seek Sullivan's assistance in making contact with Technicolor's management. On September 10, 1982, Tarnopol informed Sullivan that Perelman and MAF were interested

ings stagnated and silver prices began to fall, Technicolor stock began to decline from an April 1981 high of over $28 by nearly $10 to $18.63. The company's earnings also declined through the balance of 1981 and into 1982. By June 30, 1982, Technicolor stock was trading at $10.37 a share.

6. In September and October, 1982, MAF representatives had a series of discussions with Chase Manhattan Bank and Bank of America concerning how MAF would finance a proposed acquisition of Technicolor. MAF and the banks recognized that MAF would have to repay any acquisition debt from the sale of Technicolor's assets and from the cash flow of both Technicolor and MAF. In October the Chase consortium of banks informed Perelman that they would be willing to extend MAF an $85 million line of credit to acquire Technicolor, an amount later increased to $90 million.

in Technicolor.[7] Sullivan agreed to meet Perelman for lunch.

Sullivan did not divulge his conversation with Tarnopol or his planned meeting with Perelman to any of his fellow Technicolor board members. On the following Monday, September 13, Sullivan instructed his secretary to call his stockbroker and place a purchase order for ten thousand shares of Technicolor stock at the market.[8] At the time, Sullivan owned 21,250 shares of Technicolor.

On September 17, Sullivan met with Tarnopol and Perelman. Perelman told Sullivan that he was interested in acquiring Technicolor through a one hundred percent stock acquisition. Perelman told Sullivan that he would pay about $15 per share. Sullivan replied that he did not believe Kamerman would be interested in selling Technicolor at that price, but agreed to take the matter up with him. Perelman informed Sullivan that MAF was intent on purchasing up to five percent of Technicolor's stock in the open market. In fact, MAF had, since September 10, 1982, been purchasing Technicolor stock at market. By September 23, MAF had acquired 186,500 shares of Technicolor, representing approximately 3.7 percent of Technicolor's outstanding stock.[9]

Sullivan did not inform any of his fellow directors of the meeting with Perelman until a week later when, on September 24th, he informed Kamerman of: Tarnopol's initial call; his September 17 meeting with Perelman; and Perelman's interest in acquiring Technicolor. Sullivan suggested that Kamerman meet with Perelman, and Kamerman agreed to do so. Sullivan did not inform

Kamerman of Perelman's intent to acquire Technicolor stock or that he, Sullivan, had recently increased his holdings in Technicolor stock.

Perelman agreed to meet with Kamerman on October 4th in Los Angeles. Neither Kamerman nor Sullivan informed any of their fellow officers and directors of Technicolor of their scheduled meeting with Perelman or of Perelman's interest in acquiring Technicolor.

Prior to the October 4th meeting, Perelman again contacted Sullivan and requested to meet with him at Perelman's offices. The parties met, purportedly for Sullivan to assist Perelman in preparing for his coming meeting with Kamerman.[10]

On October 4, Kamerman and Perelman met for the first time at Technicolor's offices in Los Angeles. Sullivan was the only other director or officer of Technicolor present. In the course of the meeting, Perelman informed Kamerman that MAF would be willing to pay $20 per share to acquire Technicolor. Kamerman reacted negatively to the figure of $20, and countered that he would not consider the sale of the company or submitting the matter to his board at a price below $25 a share. Other subjects discussed apparently included: the effect an MAF acquisition of Technicolor would have on Kamerman's employment contract with Technicolor; whether Kamerman and Sullivan would continue as directors of Technicolor; the importance to Perelman of obtaining from Kamerman and Guy M. Bjorkman ("Bjorkman"), Technicolor's two largest stockholders, binding options to purchase their and

---

7. The parties differ over the details of the initial telephone conversation, specifically, whether Tarnopol stated that Perelman was interested in making an "investment" in Technicolor or whether he told Sullivan that Perelman was interested in acquiring Technicolor. The court made no findings on this point. However, the minutes of the Technicolor board meeting of October 29, 1992, support plaintiff. The minutes recite Kamerman as stating that Sullivan learned that a client of Bear Stearns wanted to meet with him "to explore the possibility of acquiring [Technicolor]."

8. While Sullivan instructed his secretary to place an order for ten thousand shares, the order exe-

cuted was for only one thousand shares. Sullivan's trading was ultimately investigated by the Securities and Exchange Commission for insider trading, and the matter was settled, with Sullivan required to pay $13,705.09 to Technicolor.

9. By October 7, MAF, through ongoing purchases, had acquired 220,000 shares of Technicolor, or about 4.8 percent of its issued and outstanding shares.

10. Sullivan's explanation for meeting with Perelman at Perelman's office was that Perelman wanted to find out "what kind of a man" Kamerman was in advance of their meeting in Los Angeles.

their spouses' stock holdings and their exercise of stock options; the income tax consequences of Kamerman's exercise of his options; and whether Sullivan would receive a finder's fee.

Kamerman also met with two of his senior officers, Technicolor's General Counsel, John Oliphant ("Oliphant"), and its Treasurer, Wayne Powitzky ("Powitzky"), for advice on: the tax consequences to Kamerman of a possible sale of Technicolor and of his Technicolor holdings; a sale's impact on his employment contract; the possibility of his joining MAF's board; and the effect a sale would have on his Technicolor stock option rights.

Kamerman also talked with Bjorkman and George Lewis ("Lewis"), two of Technicolor's directors. Lewis was Kamerman's tax attorney and Bjorkman was Technicolor's largest stockholder [11] and Chairman of Technicolor's Executive Committee. As Perelman wanted Kamerman and Bjorkman to grant him an option to purchase their shares prior to any tender offer, Kamerman sought Lewis' advice on the income tax consequences to Kamerman of sale of his option shares to Perelman in 1982 rather than in 1983.[12]

Kamerman did not inform Technicolor's President and Chief Operating Officer, Arthur Ryan ("Ryan"), also a director of Technicolor, of his meeting with Perelman. Kamerman and Ryan had a strained personal relationship. However, Martin Davis ("Davis"), a senior executive at Gulf & Western, had informed Ryan of Sullivan's New York meeting with Perelman and Kamerman's apparent willingness to consider a sale of Technicolor to Perelman. Davis was a mutual friend of Perelman and Ryan. Ryan and Davis also discussed the possibility of Ryan's future employment at Technicolor.

On October 12, Perelman met with Kamerman in Los Angeles for a second time. MAF's Chief Financial Officer and Powitzky also attended the meeting. The meeting's principal purposes were: (1) to allow MAF's Chief Financial Officer to review Technicolor

financial data; and (2) to give Perelman a tour of Technicolor's Los Angeles facilities. Other subjects included: Perelman's request for commitments from Technicolor's senior management (other than Ryan) to remain after the merger; an offer to Kamerman and Sullivan of seats on MAF's board of directors after the acquisition was completed; and the mechanics of structuring the merger. Price was apparently not discussed. By the end of this meeting, Kamerman and Perelman had reached substantial agreement on all matters discussed except price and financing. Kamerman, without consulting with any of his fellow officers or directors, then retained Goldman Sachs ("Goldman") as Technicolor's investment banker and Meredith M. Brown ("Brown"), a senior partner at the New York law firm of Debevoise & Plimpton, as its outside legal counsel.

Two days after his second meeting in Los Angeles, Kamerman told Jonathan Isham ("Isham"), a fellow director and a member of Technicolor's Executive Committee, to stand ready to attend a special meeting of the board of Technicolor, which might be called within the next several weeks. Isham, retired, was a frequent traveler.

Kamerman and Perelman continued to confer after their second Los Angeles meeting on key issues. Kamerman's concerns were: (1) MAF's ability to obtain necessary financing; (2) Perelman's commitment to go through with the acquisition; and (3) whether Technicolor could "opt out." Kamerman and Bjorkman also wanted assurances from Perelman that whatever price they received for their shares would be the highest price paid by MAF for any shares of Technicolor purchased by MAF during the course of the merger.

Perelman's objective was a series of agreements that would give Technicolor no "out." Through individual stock purchase agreements with Kamerman and Bjorkman and their spouses, MAF would acquire eleven percent of Technicolor's outstanding stock. MAF, through an option from Technicolor,

11. Bjorkman owned 273,304 shares of Technicolor and his wife owned an additional 136,102 shares. Together they owned about nine percent of the company.

12. Lewis informed Kamerman that selling his option shares in 1983 rather than 1982 would make the gain long-term.

would have the right to purchase another eighteen percent of Technicolor's authorized but unissued stock, exercisable by MAF if another bidder emerged and topped MAF's price. With such agreements in place and MAF's 4.8 percent present holdings of Technicolor, MAF would control about thirty-four percent of Technicolor's outstanding stock. Taking this evidence into account, along with Technicolor's supermajority charter provision, requiring a shareholder vote of ninety-five percent of the outstanding shares for approval of a merger, the Chancellor found a probable "lock-up" by MAF of Technicolor. *Personal Liability Opinion* at 49.

In further one-on-one private meetings and negotiations between Kamerman and Perelman, they agreed that, if the deal closed, Sullivan should receive a "finder's fee" of $150,000 for his role in introducing the parties. The amount of the fee had been suggested by Bear Stearns and was originally to have been paid by Bear Stearns.[13] Kamerman and Perelman also negotiated a post-merger employment contract for Kamerman as Chief Executive Officer of Technicolor, a contract which the court found to be significantly different from Kamerman's existing contract.[14]

On October 18 Brown and a project team from Goldman flew to Los Angeles to meet with Kamerman and senior management of Technicolor. The team consisted of a Goldman vice president, John Golden, and two junior associates. Kamerman briefed the Goldman team on his negotiations with Perelman and provided them with background information on Technicolor. Kamerman instructed the team that he wanted a report back in three days giving a preliminary view on whether Perelman's offering price of $20

per share was worth pursuing and a fairness opinion based on a price range of $20–22 per share. Kamerman also made it clear to the Goldman team that their contacts with Technicolor were to be limited to three officers of the company—Kamerman, Oliphant and Powitzky—and no one else without Kamerman's approval.[15]

Kamerman also barred the Goldman team from meeting with any of the operating heads of the Technicolor divisions and from visiting any of the Technicolor facilities. Defendants admit that until the October 29 special board meeting of Technicolor, Goldman representatives had not had access to any of Technicolor's senior officers or directors except Kamerman, Oliphant and Powitzky.

Following the meeting, Brown discussed with Kamerman the advisability of Technicolor's issuing a press release reporting MAF's negotiations to acquire the company. The parties vigorously dispute the details of the discussions. Brown testified that, before the meeting, he had drafted a proposed press release, noting the pros and cons of issuing one at that time. Brown stated that he favored release but Kamerman did not; and no press release was issued. The court found that Brown had advised that a release was not required because negotiations were not sufficiently "mature."

Back in New York, Goldman put together a valuation package; and three days later, on October 21, Goldman told Kamerman by telephone that a price of $20–$22 was worth pursuing. However, Goldman also suggested that Kamerman consider other possible purchasers for Technicolor. Goldman prepared an LBO model which included both an analy-

---

13. On advice of counsel, Sullivan's fee was later "restructured" for payment by Technicolor, after the merger, rather than before; and Bear Stearns made a corresponding reduction in its finders fee.

14. Kamerman's existing contract was for five years at a minimum annual salary of $426,216 and contained an additional consulting agreement whereby Kamerman would receive $100,000 per year for five years upon the termination of his employment. Under the renegotiated contract, the terms and salary of Kamerman's base contract were unchanged, but the compensation

provided in the consulting agreement was increased to $150,000 for each of those five years. The new contract also guaranteed Kamerman his salary for the full term of the contract in the event Kamerman left Technicolor.

15. The leader of the Goldman Sachs team did not testify at trial; but one of his associates, Sapp, testified that when the Goldman Sachs team asked to speak to Technicolor's Chief Operating Officer Ryan, Kamerman refused to permit a meeting.

sis of Technicolor's value and MAF's financial condition.[16]

Goldman performed no other financial study concerning Technicolor's sale to MAF, except a fairness opinion for presentation at Technicolor's board meeting of October 29. Goldman also revised its October 21 LBO analysis for presentation to the board on October 29.

On October 27, six days after Kamerman's receipt of Goldman Sachs' fairness opinion, he and Perelman reached an agreement on price by telephone.[17] Perelman initially offered $22.50 per share for Technicolor's stock. Kamerman, responding that he could not take that bid to the board, countered with a figure of $23 per share and stated that he would recommend its acceptance to the board. Perelman agreed to $23.

That evening Kamerman instructed Technicolor's general counsel, Oliphant, to prepare a notice for the calling of a special meeting of the Board of Directors of Technicolor for New York City at 10:00 a.m., two days later, Friday, October 29. Technicolor requested the New York Stock Exchange to halt trading in its stock. The notice of special meeting did not disclose the meeting's purpose and only a few of the directors received notice of the meeting before Thursday, the 28th.

All nine directors of Technicolor attended the meeting. Three of the directors—Lewis, Isham and Bjorkman—as previously noted, had only limited knowledge of the proposed sale of the company. Bjorkman's and Lewis' knowledge of the terms of the transaction was limited to what Kamerman had told them individually in advance of the meeting. Three other directors of Technicolor, Charles S. Simone ("Simone"), William R. Frye ("Frye") (who had formerly headed Technicolor's Consumer Processing Division), and

Richard M. Blanco ("Blanco") (who was also Chief Executive Officer of Technicolor's Government Services Division), were told nothing of Technicolor's sale prior to the meeting.

Ryan, though also President and Chief Operating Officer, knew little except what he had learned indirectly from Davis of Gulf & Western.[18] Prior to the meeting, all Kamerman had told Ryan was a cryptic remark made October 27 when Kamerman stated, "Something is going on. I'm having negotiations with somebody...."

The Technicolor board convened on October 29 to consider MAF's proposal. Kamerman told the board of Bear Stearns' contact on behalf of MAF and then outlined the history of his negotiations with Perelman. Kamerman stated that he had received an offer from Perelman of $20 a share, that he had countered with $25 and that he, on October 27, had agreed to a sale price of $23 per share. Kamerman counseled the board that $23 was "good" because it was ten times "core" earnings of between $2.30 and $2.50 a share. Kamerman recommended that MAF's $23 per share offer be accepted in view of the present market value of Technicolor's shares. He stated that they should assume a loss of $1 per share on the One Hour Photo business. He believed that Technicolor's depressed share price rendered the company vulnerable for a takeover. Kamerman stated that accepting $23 a share was "advisable rather than shooting dice" on the prospects of Technicolor's One Hour Photo venture.

Kamerman then explained the basic structure of the transaction: a tender offer by MAF at $23 per share for all the outstanding shares of common stock of Technicolor and a second-step merger with the remaining outstanding shares converted into $23 per share, with Technicolor becoming a wholly owned

---

**16.** The LBO model showed that "a $23 LBO" was feasible, taking into consideration both Technicolor's value and MAF's level of borrowing, and that $25 might be feasible. Goldman found that any price significantly higher would become "problematic" because of MAF's debt; and concluded that a price of $27 made an LBO "almost impossible."

**17.** The trial court found that date to be October 17, but the parties agree that the correct date was October 27.

**18.** The Court of Chancery found that Ryan believed Perelman would deal with him fairly and maybe even place him in Kamerman's position. In fact, the court found that shortly after the merger in February 1983, Ryan was "promoted" after Kamerman's employment was terminated.

subsidiary of MAF. Kamerman described MAF's proposed option to purchase up to 844,000 unissued shares of the company's common stock and MAF's proposed stock purchase agreement with Kamerman and Bjorkman and their wives.

Kamerman also outlined the terms of his proposed employment contract with MAF and stated that Technicolor would pay Sullivan a finder's fee of $150,000. He explained that he and Sullivan therefore had a financial interest in the proposed transaction.

Kamerman then turned the meeting over to Technicolor's outside counsel, Brown. Brown did not know that Sullivan, Bjorkman, Lewis and Isham had limited knowledge of the proposed sale and that Blanco, Simone and Frye had no substantial prior knowledge of the sale. Brown explained the structure of the proposed transaction, summarized the terms of the proposed merger, and reviewed the key documents involved.[19] Brown advised the board that it was not obligated to accept Perelman's offer, or any offer for that matter, or obligated to "shop" the company.

Goldman then made an oral presentation, based on a 78-page "board book,"[20] and explained Technicolor's financial projections, stock price and ownership data. It presented its LBO analysis and concluded with an oral opinion that a price of $23 was fair, subject to further due diligence.[21]

After these briefings several directors suggested pushing Perelman for more money but were advised that Perelman would go no higher. One director, Simone, suggested that Kamerman solicit other offers. Board consensus appeared to be that "a bird in the hand was better than a bigger one in the bush," and it ultimately rejected Simone's suggestion.

According to the minutes of the meeting, and the trial court so found, the board unanimously approved the Agreement and Plan of Merger with MAF and recommended to the stockholders of Technicolor the acceptance of the offer of $23 per share. The board also unanimously recommended repeal of the supermajority provision of the Certificate of Incorporation. The board approved the Stock Option Agreement, Sullivan's finder's fee and Kamerman's new employment contract.[22]

Immediately following the meeting, Technicolor issued a press release announcing the terms and conditions of the acquisition.

## C. The Merger

In November 1982, Technicolor filed a 14D–9 and a 13D with the Securities and Exchange Commission in which the board recommended that the shareholders tender their shares to MAF and MAF commenced an all-cash tender offer of $23 per share to the shareholders of Technicolor. By December 3, 1982, MAF had acquired 3,754,181 shares, or 82.19 percent, of Technicolor; the tender offer was closed on November 30, 1982.[23]

In December 1982, the board of Technicolor notified its stockholders of a special shareholders meeting on January 24, 1983, and distributed proxy statements. Attached to the proxy statement was Goldman's written fairness opinion dated November 19, 1982.

---

19. There is some question whether the documents were in fact present and available for the directors to study.

20. This book included median and mean values for other similar companies, a comparison of acquisitions in the motion picture business, a common stock comparison for other retailing companies, the financial performance of Technicolor and its constituent businesses, a profit and loss statement for each of Technicolor's major divisions, projections for Technicolor through 1989, projections on MAF's ability to consummate the transaction, and a Standard and Poor's tear sheet on MAF.

21. On November 19, after the merger had been approved and announced to the shareholders but before the shareholders voted on it, Goldman issued a written fairness opinion that was identical to the oral one. This written opinion was disclosed to the shareholders before their vote.

22. The minutes of this meeting were subsequently ratified at the next meeting of the Technicolor Board on November 9, 1982, a meeting at which all nine directors were again present.

23. MAF ultimately paid $125,000,000 to acquire Technicolor. Of this sum, $90,000,000 was loaned MAF by banks, $30,000,000 was obtained by MAF through the sale of junk bonds, and $5,000,000 was MAF's own money.

At the January 24, 1983 shareholder meeting, 89 percent of the shareholders voted to repeal the super-majority amendment and in favor of the proposed merger. MAF and Technicolor completed the merger and the Technicolor directors resigned from office.

## III. APPLICATION OF THE BUSINESS JUDGMENT RULE

The pivotal question in this case is whether the Technicolor board's decision of October 29 to approve the plan of merger with MAF was protected by the business judgment rule or should be subject to judicial review for its entire fairness.

### Principal Rulings Below/Issues on Appeal

#### Duty of Loyalty

Addressing first the rule's requirement of director duty of loyalty, the Chancellor found that "the Board as a whole" had not breached *its collective* duty of loyalty, notwithstanding the court's finding that at least one director, Sullivan, if not a second director, Ryan, had breached his duty of loyalty.[24] The court also found that all the directors had presumably breached their duty of care. The Chancellor found the evidence sufficient to conclude that Director Sullivan had been disloyal because of his interest in the transaction. The court also questioned whether Director Ryan was also disloyal due to a conflict of interest. Notwithstanding, the Chancellor ruled that Cinerama had failed to rebut the business judgment rule's presumption of loyalty accorded the Technicolor board's decision of October 29. The court held that the shareholder, to rebut the rule, was required to prove that the disloyal director either dominated the board or in some way tainted the presumed independence of the remaining board members voting to approve the challenged transaction. Thus, it was Cinerama's burden to establish that any director's self-interest was individually, or collectively, so "material" as to persuade a trier of fact that the independence of the board "as a whole" had been compromised. Applying this test, the court found that Cinerama had not rebutted the business judgment rule's presumption of director independence.[25]

#### Duty of Care

Turning to the duty of care element of the rule, the court ruled that it was not sufficient for Cinerama to prove that the defendant directors had collectively, as a board, breached their duty of care. Cinerama was required to prove that it had suffered a monetary loss from such breach and to quantify that loss. The court expressed "grave doubts" that the Technicolor board "as a whole" had met that duty in approving the terms of the merger/sale of the company. The court, in effect, read into the business judgment presumption of due care the legal maxim that proof of negligence without proof of injury is not actionable. The court also reasoned that a judicial finding of director good faith and loyalty in a third-party, arms-length transaction should minimize the consequences of a board's *found* failure to exercise due care in a sale of a company. The Chancellor's rationale for subordinating the due care element of the business judgment rule, as applied to an arms-length, third-party transaction, was a belief that the rule, unless modified, would lead to draconian results. The Chancellor left no doubt that he was referring to this Court's decision in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985). He stated, "In all, plaintiff contends that this case presents a compelling case for another administration of the discipline applied by the Delaware Supreme

---

24. The court found that "Sullivan [had] made money on the transaction ($150,000 fee paid by MAF—*i.e.*, Technicolor after the merger) and apparently engaged in or instituted some trades in Technicolor stock while in possession of nonpublic information." *Personal Liability Opinion* at 35. The court also found Sullivan guilty of bad faith "especially [regarding] his cooperation with Mr. Perelman before Kamerman met with Perelman." *Id.* at 36 n. 16.

25. The court ruled: "... the evidence will not support a conclusion that the Board of Directors, taken as a whole deliberative body, labored under a circumstance that created any impairment of its independence with respect to its decision to enter into the MAF merger agreement...." *Personal Liability Opinion* at 4–5.

Court in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985)." *Personal Liability Opinion* at 3.

### Issues on Appeal

This case raises at least three fundamental issues implicating the precepts and elements of the Delaware business judgment rule. Those issues are: (1) whether the Chancellor's formation and application of the duty of loyalty standard as applied to a claim of director self-interest or lack of independence is correct as a matter of law; (2) whether, assuming the Chancellor's formulation is correct as a matter of law, it supports the Chancellor's finding of no breach of the duty of loyalty in this case; and (3) whether a plaintiff should be required to establish injury from a proven claim of *board* lack of due care to rebut the rule for breach of the duty of care.

### Parties' Contentions

Cinerama asserts that the Chancellor has committed fundamental errors of law in his formulation and application of the business judgment rule's requirements of director duty of loyalty *and* duty of care. Cinerama first contends that the Chancellor has placed

upon a shareholder plaintiff burdens of proof for breach of duty of loyalty [26] and duty of care that are foreign to equity and to Delaware law.[27] Cinerama further contends that, even under the court's restatement of the duty of loyalty element of the rule, the court has clearly erred in finding that there is insufficient record evidence that a majority of the directors had breached their duty of loyalty to rebut the business judgment rule. Cinerama appeals several other adverse rulings of the Chancellor, while abandoning one claim below. Cinerama abandons its claim that the directors acted in bad faith. Except as to Director Sullivan, the court found no persuasive evidence of bad faith and concluded that the directors had acted in good faith in approving the merger transaction and related agreements. *Personal Liability Opinion* at 36–37. We address the remaining adverse rulings, referred to in section I *supra*, and appealed by Cinerama, in section VI *infra*.

Defendants concede the novelty of the Chancellor's reformulation of the rule's duty of care elements for rebutting a business judgment standard of judicial review to require a shareholder plaintiff to establish harm or loss.[28] Defendants also concede the

---

**26.** Cinerama asserts that the Chancellor's formulation of a materiality test to determine when evidence of a given director's self-interest is sufficient, without more, to overcome the presumption of director loyalty is "new law" and substitutes for a "normative, objective standard a subjective 'materiality' test." Cinerama asserts that the court has created an *"ad hoc* subjective test" and an "impossible standard," requiring a plaintiff to prove that a particular director's financial interest in the challenged transaction is "sufficiently large to create a reasonable likelihood that it actually affected his actions to the corporation's detriment." Cinerama asserts that the court's standard is "no standard at all ... [requiring] [e]ach deal, each director and each conflict ... to be reviewed to decide if it rises to the level of affecting a director's judgment." Finally, Cinerama contends that corporate directors' duties of loyalty are not not to be judged by the reasonable person standard employed to determine tort law liability cases.

**27.** Interestingly, Cinerama does not appear to attach any particular significance to Technicolor's charter requirement of director unanimity for approval of a sale of the company; nor does Cinerama appear to rely on this charter requirement as having any relevance to either the issue of director loyalty or director due care. As will

be seen below, we find that the unanimity requirement raises significant unresolved and unaddressed issues regarding the sufficiency of the evidence of director disloyalty to rebut the business judgment presumption accorded the board's action.

**28.** In support of their argument that the Chancellor "properly applied" the business judgment rule, defendants state that the Chancellor's "approach to the question of director disinterest and independence is *firmly founded* in Delaware law" (emphasis added). However, in addressing the Chancellor's critical ruling that Cinerama retained the burden of proving all elements of its case, including damages, defendants make the flat concession that "no Delaware corporate decision appears to have addressed the precise question." Defendants conclude by stating that the Chancellor's placement of a burden of proof on Cinerama to establish that it has been *harmed* by the defendant directors' breach of duties seems "unexceptionable." Interestingly, defendants discuss the question of a shareholder's burden of proof of injury solely in the context of the Chancellor's formulation of the duty of loyalty and do not address the merits of the Chancellor's requirement of proof of injury in the context of a shareholder's claims for defendant directors'

lack of any Delaware corporate law precedent for applying tort principles of liability to a fiduciary duty of care analysis. However, defendants assert that the Chancellor's requirement of proof of injury for a breach of the duty of care to be actionable, though novel, is "sound."

Defendants assert that the Chancellor's reformulation of the duty of loyalty element of the rule to require a director's interest to be "material" to be disabling is not new law, but simply different terminology. Defendants urge affirmance of all other issues appealed. By cross-appeal, defendants assert that the Chancellor's factual findings of the directors' breach of their duty of care are clearly erroneous. As stated above, and explained below, we find reversible error with respect to both director duty of loyalty and duty of care. Defendants' cross-appeal is without merit.

### Standard and Scope of Review

■ The principal issues raised involve the formulation and application of the duty of loyalty and duty of care standard of the business judgment rule. The formulation of the duty of loyalty and duty of care involves questions of law which are, of course, subject to *de novo* review by this Court. *Kahn v. Household Acquisition Corp.*, Del.Supr., 591 A.2d 166, 175–76 (1991); *Waggoner v. Laster*, Del.Supr., 581 A.2d 1127, 1132 (1990); *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del. Supr., 445 A.2d 927, 930 (1982). Assuming a correct formulation of the rule's elements, the trial court's findings upon application of the duty of loyalty or duty of care, being "fact dominated," are, on appeal, entitled to substantial deference unless clearly erroneous or not the product of a logical and deductive reasoning process. *Citron v. Fairchild Camera & Instrument Corp.*, Del.Supr., 569 A.2d 53, 64 (1989); *see also Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

### Underlying Precepts and Elements of the Delaware Business Judgment Rule

■ Our starting point is the fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors. 8 *Del.C.* § 141(a). In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders. *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984); *Van Gorkom*, 488 A.2d at 872; *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1280 (1988).

■ The business judgment rule is an extension of these basic principles. The rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation. *See Mills*, 559 A.2d at 1279; *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 954 (1985); *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971); *A.C. Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 111 (1986). The rule, though formulated many years ago, was most recently restated by this Court as follows:

> The rule operates as both a procedural guide for litigants and a substantive rule of law. As a rule of evidence, it creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment." *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 (1988). *See Allaun v. Consolidated Oil Co.*, Del. Ch., [16 Del.Ch. 318] 147 A. 257, 261 (1929).

*Citron*, 569 A.2d at 64 (applying the rule to a third-party sale of a company free of self-dealing); *see also Unocal*, 493 A.2d at 954.

---

breach of their duty of care. Nowhere in defendants' briefing of the duty of care element of the business judgment rule do defendants address the legal correctness of the Chancellor's placing

on Cinerama the burden of establishing harm to have resulted from the defendant directors' breach of their duty of care.

■ The rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be "attributed to any rational business purpose." *Sinclair Oil Corp.*, 280 A.2d at 720; *see also Unocal*, 493 A.2d at 954. Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption. *Aronson*, 473 A.2d at 812; *Van Gorkom*, 488 A.2d at 872; *Citron*, 569 A.2d at 64. To rebut the rule, a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the *triads* of their fiduciary duty—good faith, loyalty or due care. *See Citron*, 569 A.2d at 64; *Van Gorkom*, 488 A.2d at 872; *Aronson*, 473 A.2d at 812. If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments. *See, e.g., Citron*, 569 A.2d at 64; *Van Gorkom*, 488 A.2d at 872; *see also* 8 *Del.C.* § 141(a). If the rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction to the shareholder plaintiff. *Nixon v. Blackwell*, Del.Supr., 626 A.2d 1366, 1376 (1993); *Mills*, 559 A.2d at 1279; *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983).

■ Under the entire fairness standard of judicial review, the defendant directors must establish to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price. *Nixon*, 626 A.2d at 1376; *Mills*, 559 A.2d at 1279; *Weinberger*, 457 A.2d at 710. Further, in the review of a transaction involving a sale of a company, the directors have the burden of establishing that the price offered was the highest value reasonably available under the circumstances. *Mills*, 559 A.2d at 1288; *see also Citron*, 569 A.2d at 67–68 (board should obtain best available transaction for share-

holders) (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986)).

## IV. DIRECTOR DUTY OF LOYALTY/BOARD DUTY OF LOYALTY

### *Presumption of Loyalty/Duty of Loyalty*

■ This Court has traditionally and consistently defined the duty of loyalty of officers and directors to their corporation and its shareholders in broad and unyielding terms:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

*Guth*, 5 A.2d at 510; *see also Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1345 (1987). Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624 (1984); *Aronson*, 473 A.2d at 812.[29]

29. *See also* Ernest L. Folk, *Delaware General Corporation Law: A Commentary and Analysis* §§ 141.2, 144.2 (3d. ed. 1992); Dennis J. Block, Nancy E. Barton and Stephen A. Radin, *The Business Judgment Rule, Duty of Loyalty*, 74 et seq. (3rd ed. 1990); Robert Clark, *Corporate Law* §§ 4.1–5.4 (1986).

■ Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally. *See Nixon*, 626 A.2d at 1375; *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1146 (1990); *Weinberger*, 457 A.2d at 710; *Aronson*, 473 A.2d at 812; *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 110 (1952); *see also* Ernest L. Folk, *Delaware General Corporation Law: A Commentary and Analysis* § 141.2 at 141:17 and § 141.33 (3d ed. 1992).

■ We have generally defined a director as being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations. *See Aronson*, 473 A.2d at 816; *see also Pogostin*, 480 A.2d at 624. By contrast, a director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent. *See* Folk, *Delaware General Corporation Law* § 141.2 at 141:33. This principle necessarily constrains our review of the Court of Chancery's duty of loyalty formulation.

### The Chancellor's Formulation of Cinerama's Burden of Proof of Director Self–Interest

The Chancellor concluded that a plaintiff's burden of proof of a director's self-interest in an arms-length third-party transaction should be greater than in a classic self-dealing transaction where a director or directors stand on both sides of a transaction. Absent evidence of self-dealing, the court ruled that evidence of any personal or special benefit accruing to a director in an otherwise arms-length transaction does not establish a lack of independence sufficient to rebut the business judgment rule unless the director's self-interest is also found to be "material." The Chancellor then defined a director's self-interest in a third-party transaction as not material unless sufficient to create a reasonable probability: (1) that the independence of judgment of a "reasonable person" in the director's position would be affected; and (2) that such director's individual self-interest would have affected the collective decision of the board.

Applying this two-part standard, the Chancellor found Cinerama's evidence of director self-interest sufficient to meet the first part of the materiality test only as to Director Sullivan, and possibly Director Ryan, but, as to each, to fail the second requirement. The court concluded that Sullivan's or Ryan's material self-interests did not taint the board's overall independence.[30]

### When a Director's Duty of Independence is Breached for Purposes of Rebutting the Rule

The question presented is whether the Chancellor's formulation of a director's duty of independence, in terms of the quantum of evidence required to rebut the business judgment rule's presumption of director loyalty, is consistent with Delaware case precedent.

Regrettably, defendants have not provided the Court with persuasive case precedent in Delaware or elsewhere that supports the trial court's rulings. Nor has either party considered relevant Delaware statutory law. As a consequence, we decline to address certain issues raised by the parties on the ground that they are not ripe for appellate disposition.

### The Chancellor's Requirement that a Director's Self–Interest Must Be Material

The Chancellor articulated a two-part test for finding a self-interest significant enough

**30.** The Chancellor stated: "For the reasons set forth below, I conclude, first, that the evidence will not support a conclusion that the board of directors, taken as a whole deliberative body, labored under a circumstance that created any impairment of its independence with respect to its decision to enter into the MAF merger agreement and to endorse the tender offer and merger that that agreement contemplated. Moreover, a review of the credible evidence ... persuades me not only that the *board as a whole* had no such disability, but that no member of the board other than Fred Sullivan, an outside director, had on balance a material financial interest conflicting with that of the corporation's stockholders." *Personal Liability Opinion* at 4–5 (emphasis added) (footnote omitted).

to rebut the presumption of director and board independence. This two-part test requires that a shareholder show: (1) the materiality of a director's self-interest to the given director's independence; and (2) the materiality of any such self-interest to the collective independence of the board. Proof of materiality under either part requires a showing that such an interest is reasonably likely to affect the decision-making process of a reasonable person on a board composed of such persons.

We know of no Delaware decisional law which reflects this formulation or application of our business judgment rule's presumption of director loyalty as applied to a challenged third-party transaction; and the parties have not cited any authority supportive of the Chancellor's rationale. In addition, the parties have failed to examine crucial issues regarding: (1) whether the Chancellor's formulation of the second part of the materiality test is consistent with the principles underlying Delaware law; and (2) whether the Chancellor correctly applied such formulation in this case. Accordingly, while we affirm the materiality test's first part as a restatement of established Delaware law, we must remand to the Court of Chancery certain unresolved issues, later defined, regarding the Chancellor's formulation and application of the materiality test's second part.

### The First Part of the Chancellor's Materiality Test: Proof of Interest Material to Individual Director(s) Independence

■ Cinerama argues that the Chancellor's restatement of the requirements of director self-interest for purposes of rebutting the business judgment rule's presumption of director duty of independence is erroneous as a matter of law. Cinerama contends that one director's receipt of *any* tangible benefit not shared by the stockholders generally is sufficient to overcome the business judgment presumption of director and board independence. Cinerama thereby relies upon certain statements of this Court in *Aronson* and *Pogostin*, which we find to be taken out of context and selectively applied. In *Aronson*, this Court stated that a shareholder plaintiff,

to establish a breach of duty of loyalty, must present evidence that the director either was on both sides of the transaction or "derive[d] any personal financial benefit from it in the sense of *self-dealing*, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812 (citations omitted) (emphasis added). Thus, *Aronson*'s qualification that the personal financial benefit must rise to the level of self-dealing is consistent with, and in fact supports, the Chancellor's formulation. Cinerama also misreads this Court's statement in *Pogostin* that "[d]irectorial interest exists *whenever* . . . a director . . . has received, or is entitled to receive, personal financial benefit from the challenged transaction that is not equally shared by the stockholders." 480 A.2d at 624 (emphasis added).

■ Cinerama misunderstands *Pogostin*. Nothing we said there suggests that one director's self-interest, or even an act of disloyalty by that director, so infects the entire process that the board itself is deprived of the benefit of the business judgment rule. This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment rule presumption of loyalty. Provided that the terms of 8 *Del.C.* § 144 are met, self-interest, alone, is not a disqualifying factor even for a director. To disqualify a director, for rule rebuttal purposes, there must be evidence of disloyalty. *See Citron*, 569 A.2d at 65–66; *Unocal*, 493 A.2d at 958; *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964). Examples of such misconduct include, but certainly are not limited to, the motives of entrenchment, *see Gilbert*, 575 A.2d at 1146, *Polk v. Good*, Del.Supr., 507 A.2d 531, 536–37 (1986), *Unocal*, 493 A.2d at 954–56; fraud upon the corporation or the board, *see Mills*, 559 A.2d at 1283; abdication of directorial duty, *see Lutz v. Boas*, Del.Ch., 171 A.2d 381, 395–96 (1961); or the sale of one's vote. Neither *Aronson* nor *Pogostin* can be fairly read to support Cinerama's thesis that a finding of one director's possession of a disqualifying self-interest is sufficient, without more, to rebut the business judgment presumption of director/board loyalty; and no Delaware deci-

sional law of this Court supports such a result.

This Court has generally and consistently refrained from adopting a bright-line rule for determining when a director's breach of duty of independence through self-interest translates into evidence sufficient to rebut the business judgment presumption accorded board action. We agree with defendants that the question of when director self-interest translates into board disloyalty is a fact-dominated question, the answer to which will necessarily vary from case to case. *See Citron,* 569 A.2d at 64; *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988). A trial court must have flexibility in determining whether an officer's or director's interest in a challenged board-approved transaction is sufficiently material to find the director to have breached his duty of loyalty and to have infected the board's decision. Therefore, we reject Cinerama's contention that "any" found director self-interest, standing alone and without evidence of disloyalty, is sufficient to rebut the presumption of loyalty of our business judgment rule.

Cinerama also takes exception to the Chancellor's use of a reasonable person standard for determining the materiality of a given director's self-interest in a challenged corporate transaction. We agree that the Chancellor's use of the reasonable person standard is unhelpful and, indeed, confusing.[31] Therefore, we reject its use in resolving whether evidence of director self-interest is sufficient to rebut the rule.

### The Second Part of the Chancellor's Materiality Test: Proof of Interest Material to the Independence of Entire Board

The Chancellor ruled that, for purposes of rebutting the business judgment rule, any found director self-interest affecting director independence must also be found to have tainted, influenced or otherwise undermined the *board's* deliberative process. The Chancellor formulated the second part of the materiality test by stating:

> The preliminary or threshold question of independence is factual: is any differing financial interest sufficient to create a reasonable likelihood, considering all of the circumstances, that it actually affected the *directors'* actions to the corporation's detriment? In some instances an arguable or an established personal financial benefit may, when viewed in context, be found to be immaterial in fact to the exercise of a judgment motivated entirely to achieve the best available result for the corporation and (in the sale context) for its shareholders.

*Personal Liability Opinion* at 23–24 (emphasis added). It is unclear to us under this formulation precisely what a shareholder plaintiff would have to prove to demonstrate a reasonable likelihood of lack of board independence.[32]

---

**31.** The reasonable person standard lacks precision. Although it may appear to protect only director actions that do not constitute simple negligence, in practice it protects all director action not constituting gross negligence. *See Graham v. Allis–Chalmers Mfg. Co.,* Del.Supr., 188 A.2d 125, 130 (1963) (adopting "prudent man" standard in duty of care context); *but see Aronson,* 473 A.2d at 812 (adopting gross negligence standard in duty of care context); *Van Gorkom,* 488 A.2d at 873 (adopting gross negligence standard in duty of care context). The *Graham* formulation is quite confusing and unhelpful. While the opinion seems to apply a "prudent man" standard, *id.,* three paragraphs later it speaks of director liability in terms of reckless conduct. *Id.* Indeed, we have previously stated that *Graham* is not a business judgment case. *See Aronson,* 473 A.2d at 813 n. 7. We also have expressed the view that whatever the *Graham* standard may be, it has no applicability where there is a breach of the duty of loyalty. *See Mills,* 559 A.2d at 1284 n. 32.

**32.** The Chancellor's opinion posits various formulations of a plaintiff's burden of proving the *second* part of the court's materiality standard.

Under one hypothesis, materiality would be established if the director's financial interest "create[s] a reasonable *probability* that the independence of the judgment of a reasonable person in such circumstances could be affected to the detriment of the shareholders generally." *Personal Liability Opinion* at 36 (emphasis added).

Another hypothesis, considerably more stringent, is illustrated only by example. The court describes a situation where two directors, constituting a majority of the board, approve a lock-up sale of a public company in a transaction which ensures the directors a doubling of salary. The Chancellor concludes, without explanation, that

Beyond the question of burden of proof, we find the Chancellor's requirement that a director's self-interest translate into board self-interest to be an apparent borrowing of precepts embodied in 8 *Del.C.* § 144(a). Enacted in 1967, section 144(a) codified judicially acknowledged principles of corporate governance to provide a limited safe harbor for corporate boards to prevent director conflicts of interest from voiding corporate action. 56 *Del.Laws,* ch. 50 (1967); *see Beard v. Elster,* Del.Supr., 160 A.2d 731, 738 (1960) (pre-section 144(a) case applying principles embodied in section 144(a)); Folk, *The Delaware General Corporation Law* § 144.4 at 144:6 n. 11 (analogizing section 144(a) and pre-enactment law); Michael P. Dooley, *Two Models of Corporate Governance,* 47 Bus. Law 461, 489 n. 96 (1992) (section 144(a) viewed as a codification of common law). At the very least, section 144(a) protects corporate actions from invalidation on grounds of director self-interest if such self-interest is: (1) disclosed to and approved by a majority of disinterested directors; (2) disclosed to and approved by the shareholders; or (3) the contract or transaction is found to be fair "as to the corporation." [33] 8 *Del.C.* § 144(a)(1), (2) *and* (3); Folk, *The Delaware General Corporation Law* § 144:5. Section 144(a)(1) appears to be a legislative mandate that, under such circumstances, an approving vote of a majority of informed and disinterested directors shall remove any taint of director or directors' self-interest in a transaction.

*See Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218, 222 (1976).

Largely without explanation, the Court of Chancery concluded that Sullivan's finder's fee, while materially affecting his own independent business judgment, was not a material interest affecting the transaction overall because the board had approved the transaction after Sullivan's interest had been disclosed. Section 144(a) may arguably sustain this finding. *See Fliegler,* 361 A.2d at 222. Unfortunately, neither the court below nor the parties have brought section 144(a) into their reasoning or analysis.

There also remains a further significant issue that neither the parties nor the court below has addressed; that is, the relevance of Technicolor's charter requirement of director unanimity to the consequence of a finding of director self-interest. Technicolor's charter requires director unanimity for approval of a sale of the company to be ratified by less than ninety-five percent of the issued and outstanding shares of the corporation. Article Tenth of Technicolor's charter provides in pertinent part:

(2) The affirmative vote of the holders of at least ninety-five per cent ... of the outstanding shares of capital stock of the Corporation entitled to vote ... shall be required for the adoption or authorization of a ... [merger] ...

\* \* \* \* \* \*

---

the self-interest of a majority of the directors would be immaterial and that the transaction would be protected by the business judgment presumption. The example implies that self-interest material to a majority of directors may nevertheless be immaterial to the decision-making process of the board as a whole under the second part of the court's materiality test. It is unclear what a shareholder plaintiff's burden would be to meet the second part of the court's test.

**33.** Section 144(a) provides:

(a) No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in

the meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee thereof, or the shareholders.

(5) No amendment to the ... [charter] ... shall amend, alter, change or repeal any of the provisions of this Article Tenth, unless the amendment ... shall receive the affirmative vote of the holders of at least ninety-five per cent ... of the outstanding shares of capital stock of the Corporation entitled to vote ...; provided that this paragraph 5 shall not apply to ... any amendment ... unanimously recommended to the stockholders by the Board of Directors of the Corporation....

Here, the supermajority provision of the Technicolor certificate of incorporation apparently represented one facet of a takeover defense designed to ensure that its board would not enter into a merger or sale of the company without the disinterested and independent vote of each voting director.

The question becomes whether, in light of Technicolor's charter requirement of director unanimity, the Chancellor's finding of board approval of the sale of Technicolor by an "overwhelming" vote of disinterested directors was sufficient to support a finding that the board had met its duty of loyalty. We decline to address this question in the first instance and until the implications of section 144(a) are addressed by the court below. We remand this question for decision by the Court of Chancery, subject to the following observations.

If unanimity is required, will one director's self-interest or lack of independence violate the requirement? Do the provisions of section 144 override a charter requirement of unanimity?[34] Does full disclosure of a director's interest to an otherwise disinterested board satisfy Technicolor's unanimity requirement?[35]

Those issues requiring resolution on remand relating to the duty of loyalty are: (1) the precise standard of proof required under the second part of the materiality standard (see note 32 supra); (2) the legitimacy of such a standard under Delaware law and the relevance of section 144(a); (3) the effect of the unanimity requirement in Technicolor's charter on the duty of loyalty standard controlling this case; and (4) the consequence of an affirmance of the decision below finding no breach of the duty of disclosure on the question of director self-interest.

## V.  DIRECTOR AND BOARD DUTY OF CARE

Independent of our rulings under section IV, we find the Chancellor's restatement of the duty of care requirement of the rule and a shareholder plaintiff's burden of proof for rebuttal thereof, in the context of a good faith, arms-length sale of the company, to be erroneous as a matter of law. We adopt the court's presumed findings that the defendant directors were grossly negligent in failing to reach an informed decision when they approved the agreement of merger, and to have thereby breached their duty of care. Those findings are fully supported by the record. The formulation and application of the duty of care element of the rule, as applied to a third-party transaction, is explicated in *Van Gorkom.*

---

**34.** As discussed below, section 144 removes the "interested director cloud" from a transaction through three alternative methods and permits an otherwise interested transaction to be brought within the protection of the business judgment rule. *See Marciano v. Nakash,* Del.Supr., 535 A.2d 400, 403–05 (1987); *Fliegler,* 361 A.2d at 222. Under this statute, approval of an interested transaction by either a fully-informed disinterested board of directors, 8 *Del.C.* § 144(a)(1), or the disinterested shareholders, 8 *Del.C.* § 144(a)(2), provides business judgment protection. *Marciano,* 535 A.2d at 405 n. 3. Alternatively, a non-disclosing interested director can remove the taint of interestedness by proving the entire fairness of the challenged transaction. *Id.;* 8 *Del.C.* § 144(a)(3).

**35.** Examples of techniques which can restrict the influence an interested director may exert include: recusal of the interested director(s) from participation in board meetings, *see Ivanhoe,* 535 A.2d at 1343; *Puma v. Marriott,* Del.Ch., 283 A.2d 693, 695 (1971); resignation from the board by the interested director(s), *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 938 (1985); or establishment of a committee of disinterested, independent directors to review the proposal, *Weinberger,* 457 A.2d at 709 n. 7; *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981); *Citron v. E.I. Du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490 (1990). We cite these techniques without implying whether any of them would have removed an interested director taint in the Technicolor board's decision of October 29th.

Applying *Van Gorkom* to the trial court's presumed findings of director *and* board gross negligence, we find the defendant directors, as a board, to have breached their duty of care by reaching an uninformed decision on October 29, 1982, to approve the sale of the company to MAF for a per-share sale price of $23. We hold that the plan of merger approved by the defendant directors on October 29, 1982, must, on remand, be reviewed for its entire fairness, applying *Weinberger*. 457 A.2d at 711.

We think it patently clear that the question presented is not one of first impression, as the court below appears to have assumed. Applying controlling precedent of this Court, we hold that the record evidence establishes that Cinerama met its burden of proof for overcoming the rule's presumption of board duty of care in approving the sale of the company to MAF. The Chancellor's restatement of the rule—to require Cinerama to prove a proximate cause relationship between the Technicolor board's presumed breach of its duty of care *and* the shareholder's resultant loss—is contrary to well-established Delaware precedent, irreconcilable with *Van Gorkom*, and contrary to the tenets of *Unocal* and *Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173 (1986). More importantly, we think the court's restatement of the rule would lead to most unfortunate results, detrimental to goals of heightened and enlightened standards for corporate governance of Delaware corporations.

We also find the court to have committed error under *Weinberger* in apparently capping Cinerama's recoverable loss under an entire fairness standard of review at the fair value of a share of Technicolor stock on the date of approval of the merger. Under *Weinberger*'s entire fairness standard of review, a party may have a legally cognizable injury regardless of whether the tender offer and cash-out price is greater than the stock's fair value as determined for statutory appraisal purposes. *See Weinberger*, 457 A.2d at 714; *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985) (appraisal not exclusive remedy).

### *Director Duty of Care and Board Presumption of Care*

The elements, formulation and application of the Delaware business judgment rule follow from the premise that shareholders of a public corporation delegate to their board of directors responsibility for managing the business enterprise. The General Assembly has codified that delegation of authority and mandate of management generally in 8 *Del.C.* § 141(a) and, specifically, in the context of a merger or sale of a company, in 8 *Del.C.* § 251. *See Singer v. Magnavox*, Del. Ch., 367 A.2d 1349 (1976), *aff'd in part, rev'd in part*, Del.Supr., 380 A.2d 969 (1977).

The judicial presumption accorded director and board action which underlies the business judgment rule is "of paramount significance in the context of a derivative action." *Aronson*, 473 A.2d at 812. As *Aronson* states, the presumption may only be invoked by directors who are found to be not only "disinterested" directors, but directors who have both adequately informed themselves before voting on the business transaction at hand *and* acted with the requisite care. There we also stated that, for the rule to apply and attach to a particular transaction, directors "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must *then* act with requisite care in the discharge of their duties." *Id.* at 812 (emphasis added).

The duty of the directors of a company to act on an informed basis, as that term has been defined by this Court numerous times, forms the duty of care element of the business judgment rule. Duty of care and duty of loyalty are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders. *See Lutz*, 171 A.2d 381. Each of these duties is of equal and independent significance.

In decisional law of this Court applying the rule, preceding as well as following *Van Gorkom*, this Court has consistently given equal weight to the rule's requirements of duty of care and duty of loyalty. *See Aronson*, 473

A.2d at 814; *Unocal*, 493 A.2d at 955; *Moran v. Household International, Inc.*, Del. Supr., 500 A.2d 1346, 1356 (1985); *Mills*, 559 A.2d at 1280; *Barkan v. Amsted Industries, Inc.*, Del.Supr., 567 A.2d 1279, 1286 (1989); *Citron*, 569 A.2d at 64. In those decisions we have defined a board's duty of care in a variety of settings. For example, we have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end. *Citron*, 569 A.2d at 66; *Unocal*, 493 A.2d at 954 (directors cannot be passive instrumentalities during merger proceedings). In a merger or sale, we have stated that the director's duty of care requires a director, before voting on a proposed plan of merger or sale, to inform himself and his fellow directors of all material information that is reasonably available to them. *Aronson*, 473 A.2d at 812.

We have also stated that the rule is premised on a presumption that the directors have severally met their duties of loyalty (*see* section IV *supra*) and that the directors have collectively, as a board, met their duty of care. *See Barkan*, 567 A.2d at 1286; *Moran*, 500 A.2d at 1356.[36]

█ Applying the rule, a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger or sale of the company. *See Van Gorkom*, 488 A.2d at 873; *Aronson*, 473 A.2d at 812. Only on such a judicial finding will a board lose the protection of the business judgment rule under the duty of care element and will a trial court be required to scrutinize the challenged transaction under an entire fairness standard of review. *See, e.g., Van Gorkom*, 488 A.2d

at 893; *Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 257, 271 (1989).

█ The Chancellor held that "the questions of due care ... need not be addressed in this case, because even if a lapse of care is assumed, plaintiff is not entitled to a *judgment on this record*." *Personal Liability Opinion* at 6 (emphasis added). Having assumed that the Technicolor board was grossly negligent in failing to exercise due care, the court avoided the business judgment rule's rebuttal by adding to the rule a requirement of proof of injury. The court then found that requirement not met and, indeed, injury not provable due to its earlier finding of fair value for statutory appraisal purposes. In this manner, the court avoided having to determine whether the board had failed to "satisfy its obligation to take reasonable steps in the sale of the enterprise to be adequately informed before it authorized the execution of the merger agreement." *Personal Liability Opinion* at 40.

The court found authority for its requirement of proof of injury in a seventy-year-old decision that none of the parties had relied on or felt pertinent. The trial court ruled:

> because the board as a deliberative body was disinterested in the transaction and operating in good faith, plaintiff bears the burden to show that any such innocent, though regrettable, lapse was likely to have injured it. *See, e.g., Barnes v. Andrews*, 298 F. 614 (S.D.N.Y.1924).

*Personal Liability Opinion* at 8. In the absence of plaintiff's proof of injury, the court held that defendants were entitled to judgment "on all claims." The Chancellor concluded that the "fatal weakness in plaintiff's case" was plaintiff's failure to prove that it had been injured as a result of the defendant's negligence. The court put it this way:

> It is not the case, in my opinion, that *in an arms-length, third party merger* proof of a breach of the board's duty of care itself *entitles plaintiff to judgment*. Rather, in such a case, as in any case in which the

---

36. In *Barkan*, this Court stated:

> ... a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence [care] and good faith [loyalty]. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.

*Barkan*, 567 A.2d at 1286, *citing Mills*, 559 A.2d at 1286–88.

In *Moran*, this Court stated:

> The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."

*Moran*, 500 A.2d at 1356, *citing Aronson*, 473 A.2d at 812.

gist of the claim is negligence, plaintiff bears the burden to establish that the negligence shown was the proximate cause of some injury to it and what that injury was. *See Barnes v. Andrews,* 298 F. 614, 616–18 (S.D.N.Y.1924); *Cf. Virginia–Carolina Chemical Co. v. Ehrich,* 230 F. 1005, 1013 (D.S.C.1916); *Hathaway v. Huntley,* Mass. Supr., [284 Mass. 587] 188 N.E. 616, 618–19 (1933).

*Personal Liability Opinion* at 41 (underlining in original; italics added for emphasis).

On appeal, Cinerama contends: (1) that the court's assumed findings of the defendant directors' gross negligence in breach of their duty of care brought the case squarely under the control of this Court's rulings in *Van Gorkom* and, in the context of a sale of the company, under *Revlon;* and (2) that the Chancellor erred as a matter of law in invoking the tort principles implemented in *Barnes v. Andrews,* S.D.N.Y., 298 F. 614, 616–18 (1924), to grant defendants judgment on the record before the court. Cinerama's contentions are well taken, factually supported by the record and correct as a matter of law.

■■■ As defendants concede, this Court has never interposed, for purposes of the rule's rebuttal, a requirement that a shareholder asserting a claim of director breach of duty of care (*or* duty of loyalty) must prove not only a breach of such duty, but that an injury has resulted from the breach *and* quantify that injury at that juncture of the case. No Delaware court has, until this case, imposed such a condition upon a shareholder plaintiff. That should not be surprising. The purpose of a trial court's application of an entire fairness standard of review to a challenged business transaction is simply to shift to the defendant directors the burden of demonstrating to the court the entire fairness of the transaction to the shareholder plaintiff, applying *Weinberger* and its progeny: *Rosenblatt,* 493 A.2d 929; *Bershad v. Curtiss–Wright Corp.,* Del.Supr., 535 A.2d 840 (1987); and *Mills,* 559 A.2d 1261. Re-

quiring a plaintiff to show injury through unfair price would effectively relieve director defendants found to have breached their duty of care of establishing the entire fairness of a challenged transaction.

■■■ The Chancellor so ruled, notwithstanding finding from the record following trial that whether the Technicolor board exercised due care in approving the merger agreement was not simply a "close question" but one as to which he had "grave doubts." *Personal Liability Opinion* at 5–6. The trial court's doubts were based on at least five explicit predicate findings on the issue of due care: (1) that the agreement was not preceded by a "prudent search for alternatives," *id.* at 6; (2) that, given the terms of the merger and the circumstances, the directors had no reasonable basis to assume that a better offer from a third party could be expected to be made following the agreement's signing, *id.;* (3) that, although Kamerman had discussed Perelman's "approach" with several of the directors before the meeting, most of the directors had little or no knowledge of an impending sale of the company until they arrived at the meeting and only a few of them had any knowledge of the terms of the sale and of the required side agreements, *id.* at 12–13; (4) that Perelman "did, probably, effectively lock-up the transaction on October 29 when he acquired rights to buy the Kamerman and Bjorkman shares (about eleven percent together) and acquired rights under the stock option agreement to purchase stock that would equal 18 percent of the company's outstanding stock after exercise" given Technicolor's charter provision and Perelman's prior stock ownership of about five percent, *id.* at 49; and (5) that the board did not "satisfy its obligation [under *Revlon* ] to take reasonable steps in the sale of the enterprise to be adequately informed before it authorized the execution of the merger agreement." *Id.* at 40. In addition, the Chancellor noted the relevance of *Revlon* in "illuminat[ing] the scope of [the] board's due care obligations ..." and implied that the Technicolor board's failure to auction the company evidenced a breach of their duty of care.[37] *Id.*

We adopt, as clearly supported by the record, the Chancellor's presumed findings of the directors' failure to reach an informed

---

**37.** The Chancellor wrote:

... the due care theory and the Revlon theory

do not present two separate legal theories justi-

decision in approving the sale of the company. We disagree with the Chancellor's imposition on Cinerama of an additional burden, for overcoming the rule, of proving that the board's gross negligence caused any monetary loss to Cinerama. We turn to the court's reformulation of the rule's requirements for imposition of an entire fairness standard of review of the challenged transaction.

The question presented in this case is essentially the same as this Court was presented in *Van Gorkom:* whether the defendant directors, meeting as a board, satisfied the rule's presumption of board due care in meeting to consider for the first time a proposed sale of the company under terms negotiated exclusively by its chairman. We stated:

> In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del.C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement.

*Van Gorkom,* 488 A.2d at 873 (footnote omitted). *See Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140 (1989).

> fying shareholder recovery.... [B]oth theories reduce to a claim that directors were inadequately informed (of alternatives, or of the consequences of executing a merger and related agreements). An auction is a way to get information. A pre- or post-agreement market-check mechanism is another, less effective but perhaps less risky, way to get information. A "lock-up" is suspect because it impedes the emergence of information in that an alternative buyer that would pay (or would have paid) more is less likely to emerge once such an impediment is in place.
>
> *Personal Liability Opinion* at 39–40 (footnote omitted) (citations omitted).

**38.** Cinerama asserts that it is a "mystery" how the court discovered the *Barnes* case and then based its decision on *Barnes. Barnes* was apparently not cited by any of the parties in the briefings below. Cinerama refers to *Barnes* as "obscure law" that has been cited but six times since 1924 and "never for the proposition relied upon

### The Chancellor's Enlargement of the Rule to Require Cinerama to Prove Resultant Injury from the Board's Presumed Failure to Exercise Due Care

The trial court's presumed findings of fact of board breach of duty of care clearly brought the case under the controlling principles of *Van Gorkom* and its holding that the defendant board's breach of its duty of care required the transaction to be reviewed for its entire fairness. The Chancellor, without stating any reasons for finding *Van Gorkom* not to be controlling, chose instead to adopt the actionable negligence principles of *Barnes. Personal Liability Opinion* at 41–43.[38] Applying *Barnes,* the Court of Chancery concluded that Cinerama was not entitled to relief because it had failed to present evidence of injury caused by the defendants' negligence.

The Chancellor's reliance on *Barnes* is misguided.[39] While *Barnes* may still be "good law," *Barnes,* a tort action, does not control a claim for breach of fiduciary duty. In *Barnes,* the court found no actionable negligence or proof of loss—and granted defendant's motion for a nonsuit or grant of judgment for defendant on the merits. Here, the court was determining the appropriate standard of review of a business decision and whether it was protected by the judicial presumption accorded board action. The tort principles of *Barnes* have no place in a business judgment rule standard of review analysis.

by the Chancellor." Defendants make no adequate response.

**39.** In *Barnes,* the receiver of a failed corporation brought suit against Andrews, who was one of the corporation's former directors, for negligence in the performance of his duties. Andrews was charged with taking little, if any, active role as a director because he attended only part of one of two important board meetings. The court found Andrews to have been negligent in his inattention to his directorial duties but not liable for damages since plaintiff failed to prove that the company's insolvency actually resulted from Andrews' negligence rather than the negligence of his fellow directors. Then District Judge Learned Hand ruled:

> Therefore I cannot acquit Andrews of misprision in his office, though his integrity is unquestioned. The plaintiff must, however, go further than to show that he should have been more active in his duties. *This cause of action rests upon a tort,* as much though it be a tort of omission as though it had rested upon a posi-

To inject a requirement of proof of injury into the rule's formulation for burden shifting purposes is to lose sight of the underlying purpose of the rule. Burden shifting does not create *per se* liability on the part of the directors; rather, it is a procedure by which Delaware courts of equity determine under what standard of review director liability is to be judged. To require proof of injury as a component of the proof necessary to rebut the business judgment presumption would be to convert the burden shifting process from a threshold determination of the appropriate standard of review to a dispositive adjudication on the merits.

This Court has consistently held that the breach of the duty of care, without any requirement of proof of injury, is sufficient to rebut the business judgment rule. *See Mills,* 559 A.2d at 1280–81; *Van Gorkom,* 488 A.2d at 893. In *Van Gorkom,* we held that although there was no breach of the duty of loyalty, the failure of the members of the board to adequately inform themselves represented a breach of the duty of care, which of itself was sufficient to rebut the presumption of the business judgment rule. *Van Gorkom,* 488 A.2d 858. A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair. *Id.* at 893; *Shamrock Holdings,* 559 A.2d at 271. Cinerama clearly met its burden of proof for the purpose of rebutting the rule's presumption by showing that the defendant directors of Technicolor failed to inform themselves fully concerning all material information reasonably available prior to approving the merger agreement. Our basis for this conclusion is the Chancellor's own findings, enumerated above.

■■■ In sum, we find the Court of Chancery to have committed fundamental error in rewriting the Delaware business judgment rule's requirement of due care. The court has erroneously subordinated the due care element of the rule to the duty of loyalty

element. The court has then injected into the duty of care element a burden of proof of resultant injury or loss. In this regard, we emphasize that the measure of any recoverable loss by Cinerama under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the "true" value as determined under appraisal proceedings. Under *Weinberger,* the Chancellor may "fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages." 457 A.2d at 714. The Chancellor may incorporate elements of rescissory damages into his determination of fair price, if he considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances. *Id.* Thus, we must reverse and remand the case to the trial court with directions to apply the entire fairness standard of review to the challenged transaction. *See, e.g., Van Gorkom,* 488 A.2d 858; *Shamrock Holdings,* 559 A.2d 257.

## VI. REMAINING ISSUES ON APPEAL

Cinerama asserts four remaining claims: (1) that the merger was void *ab initio;* (2) that MAF and Perelman, after becoming majority shareholders of Technicolor, failed to satisfy their burden of proving the transaction's entire fairness; (3) that the Chancellor should be required to determine the appropriateness of rescissory damages for the defendants' breach of their duty of loyalty or duty of care; and (4) that the Chancellor committed legal error in failing to find defendants to have breached their duty of disclosure to Technicolor's shareholders. As to Cinerama's first three contentions, we find them to be lacking in merit; but we find arguable merit, requiring remand, as to the fourth contention.

■■■ Cinerama first contends that because Director Simone voted against the merger, the Technicolor board's less-than-unanimous approval of the merger did not satisfy the unanimity requirement of Technicolor's charter.[40] Whether Simone voted

tive act. The plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided the loss, and what loss it would have avoided.
*Barnes,* 298 F. at 616 (emphasis added).

**40.** As discussed in section IV above, Technicolor's charter contained an anti-takeover provision

requiring a unanimous vote of the board of directors to repeal its provision that any merger or sale of the company must receive the approval of ninety-five percent of the shares outstanding.

against the merger was a question of fact as to which the evidence was in conflict. The trial court rejected Simone's deposition testimony, given seven years later, and when he was in frail health, that he had, contrary to the minutes, voted against the resolution authorizing acceptance of the MAF offer. We defer to the trial court's finding, there being substantial evidence to support it. *Levitt v. Bouvier,* 287 A.2d at 673; *Citron,* 569 A.2d at 64. Accordingly, we affirm the court's rejection of Cinerama's claim that the merger was void *ab initio* because Simone had cast an opposing vote.

Cinerama next argues that MAF and Perelman breached their fiduciary duties owed Cinerama after becoming the majority shareholder of Technicolor. The Chancellor rejected Cinerama's contention. Finding that neither of the defendants had dominated Technicolor's board, the court concluded that defendant Perelman had not "assume[d] the duties of care and loyalty of a director of the corporation." *Personal Liability Opinion* at 46. Hence, defendants were not required to establish the transaction's entire fairness to Cinerama. We find the issue to be a mixed question of fact and law, that the court's findings are supported by the record and that its conclusions are not erroneous as a matter of law.

Cinerama's third argument is premised on certain statements in *Cede I* that proof of breach of fiduciary duty may entitle Cinerama to rescissory damages. In *Cede I,* we observed, "if it is determined that the merger should not have occurred due to fraud, breach of fiduciary duty, or other wrongdoing on the part of the defendants, then Cinerama's appraisal action will be rendered moot and Cinerama will be entitled to receive rescissory damages." *Cede I,* 542 A.2d at 1191. Our statement was overbroad. We did not intend thereby to overrule established Delaware law conditioning a recovery of rescissory damages on a defendant's failure to meet its burden of showing the entire fairness of the transaction. *See* section IV *supra.*

■■■■ Lastly, Cinerama challenges the trial court's findings that the Technicolor defendant directors did not breach their duty of disclosure owed the shareholders. On appeal, Cinerama reiterates its claim below that defendants breached their duty of disclosure in their filings in connection with the tender offer and in their proxy solicitation in connection with the merger. Delaware corporations have a fiduciary duty to disclose completely all available material information when obtaining shareholder approval. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 (1992). The Chancellor appropriately ruled that Cinerama retained the burden of proof of showing that the alleged nondisclosures were material, as defined under *Rosenblatt,* 493 A.2d at 944–45. Furthermore, the record supports the trial court's finding that "the bulk of [the directors'] alleged nondisclosures are plainly not material" and that Cinerama's other contentions regarding disclosure had "no basis in fact." *Personal Liability Opinion* at 55–56. However, we find that we must remand for further consideration of the Chancellor's purported findings with respect to the lack of materiality of Ryan's apparently undisclosed self-interest.

■■■■ As to the latter issue, the Chancellor concluded that the directors' failure to disclose Ryan's self-interest to Technicolor's shareholders did not constitute a breach of their duty of disclosure. The Chancellor acknowledged, tacitly, if not explicitly, that Ryan had not disclosed his presumed self-interest to the board. Notwithstanding, the court's decision may be construed as holding that Ryan's undisclosed self-interest was rendered immaterial by the Technicolor board's unanimous approval of the transaction. Our review of this issue raises a mixed question of fact and law requiring deference to the factfinder. *See Kahn,* 591 A.2d at 171. Our concern lies in the soundness of the assumed proposition. It is unclear whether the trial court's finding of immateriality was premised on its reasoning that a given director's material self-interest, though undisclosed, may be found to be immaterial, depending on the vote of the board as a whole. However, the decision below may also be read as being premised upon a traditional analysis regarding the hypothetical effect of a failure to disclose a material fact upon a reasonable shareholder's "total mix" of information through a *Rosenblatt* analysis. 493 A.2d at 944–45; *TSC Industries, Inc. v. Northway,*

*Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 779 (1993). Our concern is over the former premise; that is, that a unanimous vote of a board of directors may render immaterial as a matter of law a given director's undisclosed material self-interest in the transaction approved. *See* section IV *supra*. Therefore, we find it necessary to remand, with jurisdiction reserved as to this issue only, for clarification by the court of the basis of its ruling below. ·

## VII. CONCLUSION

We find no error in the Chancellor's reformulation of a materiality test for determining director self-interest. We find error in the trial court's adoption of the reasonable person standard. We decline to determine the correctness of the second part of the court's materiality test, for the reasons stated. We remand that issue to the trial court to consider the relevance and effect of section 144(a) on such standard as well as the effect of Technicolor's charter requirement of director unanimity as applied to this transaction. We reverse the trial court's restatement of the duty of care element of the rule. We find the Chancellor to have erred as a matter of law in requiring a plaintiff shareholder to show injury to rebut the business judgment presumption of care; and, on remand, we instruct the court to review the transaction for entire fairness under *Weinberger*. We affirm the Chancellor's rulings on Cinerama's remaining claims, but remand for clarification by the Chancellor of his ruling on duty of disclosure as to Director Ryan's presumed material self-interest.

\* \* \*

Affirmed in part; Reversed in part; Remanded for further proceedings consistent with this decision, with jurisdiction reserved only as to the duty of disclosure.

### Upon Return from Remand For Clarification of Ruling on Duty of Disclosure

On November 12, 1993, this Court, after issuing its opinion dated October 22, 1993, remanded this case to the Court of Chancery for determination of a limited issue, with jurisdiction retained only as to that issue. We requested the Court of Chancery to clarify the basis for its ruling that the Technicolor board's failure to disclose to its shareholders the self-interest of director Arthur Ryan did not constitute a breach of the defendant directors' duty of disclosure. We requested clarification of the Court of Chancery's reasoning for finding immaterial Ryan's failure to disclose his self-interest in the transaction to his fellow board members before their vote at the October 29, 1982 meeting.

The Court of Chancery, by its January 7, 1994 memorandum response to this Court, establishes that the court employed the materiality analysis standard of *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944–45 (1985), in making its finding. We conclude that the court's disclosure ruling is the product of a logical and deductive reasoning process and sustainable as a matter of law. We therefore affirm the court's finding that the defendant directors did not breach their duty of disclosure to the Technicolor shareholders in failing to disclose Ryan's material self-interest in the transaction.