PRIDE INTERNATIONAL, INC., Appellant,

v.

Paul A. BRAGG, Appellee.

No. 01–07–00188–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 3, 2008.

Charles Lee Winkelman, Jones Day, Neil G. Martin, Houston, TX, for Appellant.

Caren Schmulen Sweetland, Robin C. Gibbs, Gibbs & Bruns, L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

JANE BLAND, Justice.

This case arises from a falling out between a corporate CEO and his former employer. After Pride International, Inc. fired Paul Bragg and paid him a severance owed under his employment agreement, Bragg sued Pride for breach of that contract, contending that the Pride owes him three times as much in severance as it had paid him. Pride counter-claimed against Bragg for breach of fiduciary duty, contending that Bragg had misrepresented his opinion of the value of the severance package to Pride and its shareholders, in that he never disclosed that he thought the agreement (and others like it) was worth so much. The trial court granted summary judgment both to Pride and to Bragg, so that both received a take-nothing judgment. Both appeal the trial

court's judgment. We conclude that the employment agreement is not ambiguous, and that Bragg failed to raise a fact issue as to breach of the agreement. We further conclude that Pride has raised no issue of fact under Delaware law as to any material breach of fiduciary duty. We therefore affirm.

## Background

### Bragg's Employment with Pride

Pride hired Bragg as its chief financial officer ("CFO") in July 1993. In 1998, Pride promoted Bragg to President and Chief Operating Officer. In February 1999, the parties executed an employment agreement. The following month, Pride promoted Bragg to Chief Executive Officer ("CEO"), after the current CEO, Ray Tolson, retired.

Bragg served as Pride's CEO from March 1999 until June 2005, when Pride asked for, and received, Bragg's resignation. Pride's board chairman provided Bragg with a "Summary of Separation Benefits" term sheet, which outlined the termination benefits that Bragg would receive pursuant to the February 1999 employment agreement. The following day, Bragg executed a resignation letter agreement. Thirty days following his resignation, Pride paid Bragg $8 million in severance, as contemplated in the letter of resignation.

### The Employment Agreement

The provisions in the agreement that govern Bragg's term of employment and termination are sections 3.03 and 3.05. They read:

> 3.03 TERM OF EMPLOYMENT ("EMPLOYMENT PERIOD"). Executive's regular employment (no Change in Control being presently contemplated) will commence on the Effective Date of this Agreement and will be for a term of two (2) years ending at 12:00 o'clock midnight February 4, 2001; thereafter,

the Term of Employment of Executive will be automatically extended for successive terms of one (1) year each commencing February 5, 2001, and on February 5 of each year thereafter, unless Company or Executive gives written notice to the other that employment will not be renewed or continued after the next scheduled expiration date which is not less than one year after the date that the notice of non-renewal was given. All extended employment terms will be considered to be within the Employment Period while Executive is employed with the Company.

> 3.05 TERMINATION WITHOUT CHANGE IN CONTROL. The Company shall have the right to terminate Executive at any time during the Employment Period (including extended term). Should the Company choose not to renew or extend the Employment period of this Employment Agreement or choose to terminate the Executive during, or at the end of, the Employment Period, or in the event of death or disability of the Executive, if the termination is not after a Change of Control and is not for cause, the Company shall, within thirty (30) days following such termination, pay and provide to the Executive:

> a. An amount equal to two full years of his base salary . . .

> b. The Company shall provide to Executive for a period of two (2) full years following the Date of Termination, life, health, accident and disability insurance . . . .

> c. An amount equal to two (2) times the target award for the Executive under the Company's annual bonus plan for the fiscal year in which the termination occurs . . . .

The section 3.05 severance benefits also include the value of the Executive's retire-

ment plan, stock options, and life, health, hospitalization, medical, and accident benefits to the Executive's spouse and dependents for same term as the Executive's benefits.

Though Bragg acknowledges that he received severance pay pursuant to the agreement's provision dealing with termination, he contends that he is entitled to $17 million in additional compensation. He urges that, under section 3.03 of the agreement, the term of his employment had "renewed" the February before he resigned, and thus, Pride's termination was not effective until the end of the renewal period for the purpose of calculating his severance. Under his reading of section 3.03 of the agreement, Bragg contends that he should have continued to receive the salary and benefits he received as a current employee, listed in section 3.04 of the agreement, through the end of his renewal period, plus the severance. Section 3.04 of the agreement sets forth Bragg's compensation during the Employment Period. It reads:

3.04 COMPENSATION AND BENEFITS. During the Employment Period the Executive shall receive the following compensation and benefits:

a. He shall receive an annual base salary of not less than his [sic] annual base salary which is $334,000, with the opportunity for increases, from time to time thereafter, which are in accordance with the Company's regular executive compensation practices. Executive's salary will be reviewed at least annually by the Compensation Committee of the Board of Directors.

b. . . . [H]e shall be eligible to participate on a reasonable basis, and to continue his existing participation, in annual bonus, stock option and other incentive compensation plans which provide opportunities to receive compensation in addition to his annual base salary which

are the greater of: (i) the opportunities provided by the Company for Executives with comparable duties, or (ii) the opportunities under any such plans in which he was participating immediately prior to the Effective Date of this Agreement.

c. . . . [H]e shall be entitled to receive and participate in salaried employee benefits including, but not limited to: medical, life, health, accident and disability insurance and disability benefits. . . .

Section 3.04 benefits also include retirement benefits, paid vacations, use of Company car, and participation in incentive stock and benefit plans.

Pride denies that section 3.03 requires it to compensate Bragg beyond the amount set forth in section 3.05. It observes that section 3.05 grants it the "right to terminate [Bragg] at any time (including any extended term)."

*The Breach of Fiduciary Duty Claim*

During Bragg's tenure, he rejected claims against Pride advanced by two departing officers, under sections 3.03 and 3.05 of the employment agreement, which urged the very interpretation he now makes against Pride. These former officers, John O'Leary, a former president of Pride, and Jonathan Talbot, a former vice-president of marketing, had employment agreements similar to Bragg's agreement. Both O'Leary and Talbot advanced claims for additional compensation under the same interpretation of section 3.03 that Bragg now advances, and Bragg, as CEO, rejected them. In addition, In March 1999, the head of the compensation committee asked Bragg to summarize the severance due to the outgoing CEO, Ray Tolson, if Pride terminated him without cause. Bragg included in Tolson's benefits only the severance outlined in section 3.05.

In response to Pride's contract defenses, Bragg testified that he had always understood his contract to require additional compensation under the section 3.03 renewal provision. Bragg's assertion that he had held this opinion while CEO but did not advise Pride of it or otherwise act to clarify the language prompted Pride to counter-sue him for breach of fiduciary duty, contending that Bragg had failed to disclose material information to Pride— namely, Bragg's understanding of the employment agreement.

*The Trial Court's Ruling*

In October 2006, the trial court granted summary judgment dismissing with prejudice Bragg's breach of contract claim for additional compensation under section 3.03 of the agreement. In December 2006; the trial court granted summary judgment dismissing with prejudice Pride's counterclaim against Bragg for breach of fiduciary duty. The trial ordered that both parties take nothing by their suits.

## Summary Judgment

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of law. TEX.R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). In our review, we take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett,* 164 S.W.3d at 661; *Knott,* 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Our task is to "consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented." *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755–56 (Tex.2007) (citing *Wal–Mart Stores, Inc. v. Spates,* 186 S.W.3d 566, 568 (Tex.2006); *City of Keller v. Wilson,* 168 S.W.3d 802, 822–25 (Tex.2005)). When, as here, a summary judgment does not specify the grounds on which it was granted, we will affirm the judgment if any one of the theories advanced in the motion is meritorious. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 157 (Tex.2004).

## BRAGG'S APPEAL

Bragg contends that Pride breached its employment agreement with him by (1) failing to compensate Bragg for its failure to give him notice of non-renewal of the agreement before terminating his position as CEO; (2) awarding $400,000 as his 2004 bonus rather than $1.023 million; and (3) requiring him to pay the employee portion of the insurance premiums for the benefits provided to him after his termination. Bragg contends that the agreement is, at a minimum, ambiguous on these matters, thus precluding summary judgment. Pride responds that section 3.05 of the agreement unambiguously provides that Pride may terminate Bragg at any time without notice, including during any extended term, and expressly sets forth all severance compensation, whether the termination be "during, or at the end of, the Employment Period."

*Contract Interpretation*

Our primary concern in interpreting a contract is to ascertain and give effect to the intent of the parties as it is expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006). To achieve this objective, "courts should examine and consider the entire writing in an effort to harmonize

and give effect to all the provisions of the contract so that none will be rendered meaningless." *Dorsett*, 164 S.W.3d at 662.

Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). If the contract is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex.2005) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997). An unambiguous contract is construed according to the plain meaning of its express wording. *Dorsett*, 164 S.W.3d at 662. Unambiguous contracts are enforced as written. *Heritage Res., Inc.*, 939 S.W.2d at 121.

 In contrast, "[a] contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." Id. We determine whether a contract is ambiguous by examining it as a whole, in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex.2003). If a court determines a contract is ambiguous, then a factfinder may consider extraneous evidence to ascertain the true meaning of the instrument. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). If an ambiguity exists, either patent or latent, contract interpretation becomes a fact issue, resolved by deciding the parties' true intent. *Coker*, 650 S.W.2d at 394; *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 379 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

*Analysis*

 Here, the parties agree that Pride did not notify Bragg of the expiration of the employment agreement as authorized in section 3.03. The dispute concerns whether Pride was required to give one-year's notice under pain of continuing to pay Bragg a salary or whether, as expressed in section 3.05, Pride could terminate at any time (including during the Employment Period) so long as it provided the agreed-upon severance. Bragg reads sections 3.03 and 3.05 as enumerating separate obligations, triggering multiple remedies, requiring Pride to provide salary and compensation under section 3.04 of the agreement as if he remained in Pride's employ, in addition to severance benefits until the agreement expired. Pride observes, however, that notice of non-renewal does not trigger any compensation other than that defined in section 3.05 because section 3.05 expressly allows Pride to terminate an executive at any time, including "during the Employment Period," provided that it compensates the Executive with the severance benefits enumerated in that section.

We agree with the trial court that sections 3.03 and 3.05 are not ambiguous. Section 3.03 sets forth the period of Bragg's employment, or as the agreement defines it, the "Employment Period." It declares: "All extended employment terms will be considered to be within the Employment Period while the Executive is employed with the Company." Bragg asserts that this sentence relates only to an employee's voluntary departure, but the provision contains no limiting language. Section 3.03 says that when an employee is employed with the company, he is within his employment period, and thus is entitled to compensation under section 3.04. It does not suggest that a fired employee nonetheless continues to be within the em-

ployment period. Under section 3.03, an executive who is not employed with the company is not within any "employment period."

Tacitly conceding this interpretation of section 3.03 to be reasonable, Bragg claims that section 3.04 suggests otherwise. Section 3.04, which outlines an executive's compensation and benefits, during employment, states: "During the Employment Period, the Executive shall receive the following compensation and benefits...." Bragg urges us to construe this language in conjunction with yet another section of the agreement, section 2.06, which defines "termination" as used in the agreement:

> "[T]ermination shall mean termination, prior to the expiration of the Employment Period, of the employment of the Executive with the Company { including death and disability (as described below)} for any reason other than cause (as described below) or voluntary resignation (as described below). Termination includes "Constructive Termination" as described below. Termination includes non-renewal or failure to extend this Agreement at the end of any employment term, except for cause.

The agreement then elaborates on the various kinds of termination, including disability, cause, constructive termination, and voluntary resignation. Section 2.06 concludes by stating:

> Termination that entitles the Executive to the payments and benefits provided in the "Termination Payments and Benefits" Section hereof shall not be deemed or treated by the Company as the termination of the Executive's employment or the forfeiture of his participation, award, or eligibility, for the purpose of any plan, practice or agreement of the Company referred to in the Compensation and Benefits Section hereof.

Bragg suggests that the word "agreement" in this last sentence includes the employ-

ment agreement itself. Thus, he asserts, his termination under section 3.05 should not be deemed a termination of his employment for the purpose of his employment agreement, but instead, he remained within his Employment Period even after termination for purposes of calculating the money owed to him until the expiration of the period following renewal of the agreement. Like the trial court, we disagree with Bragg's interpretation. Section 2.06 refers to the compensation and benefits in section 3.04; it does not modify "termination" as defined under the agreement. The only reasonable construction of "plan, practice or agreement" in section 2.06 is as a reference to the insurance, stock, and retirement plans for which Bragg continues to be eligible under his severance package as described in section 3.05. If we applied Bragg's interpretation and construed "agreement" in section 2.06 to include the Employment Agreement as a whole, it would render the last sentence of section 3.03 and the entirety of section 3.05 meaningless. That is not a reasonable interpretation. *See Dorsett*, 164 S.W.3d at 662 ("Courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").

Bragg further relies on section 3.05(j), a savings clause, which states: "The Company's obligation under this Section to continue to pay or provide ... insurance to the Executive and [his dependents] during the remainder of the Employment Period shall be reduced" when Executive is provided these benefits by another employer. According to Bragg, if the employment period were over, section 3.05(j) would be meaningless, because there would be no employment period during which to provide insurance benefits. Section 2.06, however, states that the Employment Period is not treated as termi-

nated with respect to the employee benefit plans made a part of the severance package under section 3.05. Bragg thus is treated as within his Employment Period under section 3.05(j) only for purposes of the insurance and other benefits expressly provided as a part of his severance.

■ Finally, Bragg contends that sections 3.03 and 3.05 are ambiguous when read together because section 3.03 requires notice of termination, while section 3.05 allows an employee to be terminated at any time. We conclude that these sections can be harmonized without creating any ambiguity.

■ Section 3.03 creates a term of employment for Bragg, or an Employment Period. The contract guaranteed Bragg a term of at least one, and as much as two years' employment under his extended term.[1] Section 3.05 allows Pride to terminate an executive at any time, including "during, or at the end of the Employment Period," as long as it pays the executive the benefits enumerated in section 3.05. Bragg contends that an interpretation that section 3.05 is the sole compensation when Pride terminates an employee without notice renders section 3.03 meaningless. We disagree. The severance provided in section 3.05 provides Bragg with two years' salary and benefits, which is the maximum amount of time that an employee could have received salary and benefits under the agreement upon automatic renewal. Section 3.05 thus provides salary and benefits for at least the same amount of time that an employee would receive them if he had been provided notice under section 3.03. "When an employment contract requires a certain period of notice, the employment may be cancelled on shorter notice or upon none at all if the employee is paid wages or salary for the specified notice period." *Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W.2d 320, 326 (Tex. App.-Houston [1st Dist.] 1995, no writ); *see also Stolz v. Wells*, 43 S.W.2d 163, 165 (Tex.Civ.App.-Beaumont 1931, no writ). With the severance payment, Pride paid Bragg his salary for the specified notice period.

Section 3.05 contemplates the possibility that an executive could be terminated "during" his employment period and outlined the benefits owed in such an event. A severance pay provision serves "to assure a worker whose employment has terminated certain funds while he seeks another job." *Martin v. Mann Merchandising, Inc.*, 570 S.W.2d 208, 209 (Tex. Civ.App.-Eastland 1978, writ ref'd n.r.e.). Section 3.05 accomplishes that purpose by unambiguously enumerating the benefits available in the event of termination regardless of whether it occurs due to expiration of the employment period or earlier, due to Pride's exercise of its right to fire an executive at any time during the employment period. We hold that the exercise of an express right to terminate without cause terminates an agreement that is then in effect because there has been no notice of non-renewal. Because the contract does not require Pride to pay $17 million additional compensation under section 3.03, Pride did not breach the contract by failing to provide additional compensation beyond the $8 million it paid pursuant to its obligation under section 3.05.

*2004 Annual Bonus*

■ Bragg contends that Pride also breached its contract by improperly reduc-

---

[1]. The contract required Pride to give Bragg notice of termination at least one year prior to the renewal date of February 5. Thus, if Pride did not give Bragg notice of non-renewal until the renewal date, Bragg's employment period would continue for two years. This is because the notice would be one day less than one year from the date of the notice of non-renewal, so the notice would not take effect until February 4 of the following year.

ing his 2004 incentive bonus. According to Bragg's summary judgment evidence, his target bonus was $1,023,000, yet he received only $400,000 from Pride. Bragg asserts that although Pride had discretion to award bonuses, its discretion is limited, and Pride was required to treat Bragg on the same basis that it treated other Pride executives of comparable duties who received proportionally larger bonuses. With respect to bonuses, Section 3.04 contract states:

> "[Bragg] shall be eligible to participate on a reasonable basis ... in incentive compensation plans which provide opportunities to receive compensation in addition to his annual base salary which are the greater of: (i) the opportunities provided by the Company for Executives with comparable duties; or (ii) the opportunities under any such plans in which he was participating immediately prior to the Effective Date of this Agreement."

Bragg does not contend that he was not given comparable participation opportunities in incentive compensation plans, only that his bonus was lower than comparable executives. Pride's proxy statements state that any bonus is discretionary. The employment agreement merely provides that Bragg is eligible to receive bonuses, but it does not require that they be paid; rather, it refers to incentive plans that are separate from the agreement. Bragg has failed to raise a fact issue that his 2004 bonus was nondiscretionary under the employment agreement. We thus hold that the trial court properly granted summary judgment on this claim.

*Insurance Benefits*

█ Bragg's final issue is that Pride breached its employment agreement by not paying the employee portion of his insurance benefits provided under section 3.05(b), which states: "The Company shall provide to Executive for a period of two (2) full years following the Date of Termination, life, health, accident, and disability insurance. These benefits are not to be less than the highest benefits furnished to the Executive during the term of this Agreement." This section does not support Bragg's contention that Pride must pay the employee's share of insurance premium costs. It merely obligates Pride to provide coverage and benefits that match those Bragg received while in Pride's employ, which it has done. We hold that the contract does not require Pride to pay Bragg's share of his insurance costs if he paid them as an employee, and thus, Pride did not breach its contract. The trial court therefore properly granted summary judgment on this claim.

## PRIDE'S APPEAL

Pride contends that Bragg breached his fiduciary duty by failing to disclose to Pride his personal opinion that his employment agreement obligated Pride to pay him both severance pay under section 3.05 and a salary until his employment period otherwise would expire. It further contends that Bragg misrepresented the extent of Pride's potential liability for his and similar employment agreements in failing to disclose his interpretation of the agreement. We agree with the trial court that Bragg is entitled to summary judgment on Pride's claim.

*Breach of Fiduciary Duty Under Delaware Law*

█ Because Pride is incorporated in Delaware, Delaware law governs Pride's breach of fiduciary duty claim.[2] In a

---

**2.** Under article 8.02 of the Texas Business Corporation Act, the rights and duties of directors and stockholders in corporate matters are governed by the laws of the state of incorporation. Tex. Bus. Corp. Act Ann. art 8.02 § A (Vernon 2003); *Hollis v. Hill,* 232 F.3d 460, 464–65 (5th Cir.2000).

breach of fiduciary duty case, the plaintiff must prove that: (1) a fiduciary duty exists; and (2) a fiduciary breached that duty. *See O'Malley v. Boris,* 742 A.2d 845, 849–50 (Del.1999) (analyzing breach of fiduciary duty claim based on two-part test). In addition to his CEO title, Bragg also served as a director. Directors of Delaware corporations have a fiduciary relationship with both the stockholders and the corporation upon whose board they serve.[3] *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998). The director's fiduciary duty to both the corporation and its shareholders is a "triad: due care, good faith, and loyalty." *Id.; see also Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993).

■■■■■ These general fiduciary duties specifically include a duty of disclosure. *Malone,* 722 A.2d at 10. This duty obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event. Id.; *see also Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del.1989) (fiduciaries may not "use superior information or knowledge to mislead others in performance of their own fiduciary obligations"). Disclosure does not mean, however, that a board must know every fact, and directors have no duty to disclose speculative or contingent information. *See Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 179 (Del. Ch.2005); *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1280 (Del.1994) (Generally, "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."). Rath-

er, directors are responsible for considering material facts that are reasonably available, not those that are immaterial or out of the board's reasonable reach. *Benihana,* 891 A.2d at 179.; *Brehm v. Eisner,* 746 A.2d 244, 259 (Del.2000). The term "material" in this context means "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decision-making." *Benihana,* 891 A.2d at 179 (quoting *Brehm,* 746 A.2d at 260 n. 49). This meaning is distinct from the use of the term "material" in the quite different context of disclosure to stockholders in which "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Brehm,* 746 A.2d at 260 n. 49; *O'Malley v. Boris,* 742 A.2d 845, 850 (Del. 1999). In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). A threshold question, therefore, is whether the information that Pride alleges should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not support a claim that Bragg violated his disclosure duties.

### Analysis

■■■■ Pride contends that Bragg's opinion concerning his employment agreement

---

**3.** Texas law recognizes a similar relationship between a corporation and its director. *See Myer v. Cuevas,* 119 S.W.3d 830, 835–36 (Tex. App.-San Antonio 2003, no pet.) (corporate officers owe fiduciary duties to the corporations they serve); *see also Hughes v. Houston*

*Northwest Medical Center, Inc.,* 680 S.W.2d 838, 843 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (corporate officers and directors owe corporation and shareholders duty to act only in their best interest).

is material because: (1) if Bragg's opinion as to the interpretation of the agreement were correct, Pride's potential liability under his and similar agreements could have been increased by sixty to one-hundred million dollars; (2) Bragg's opinion concerned employment contracts other than his own, and as CEO, his opinion was material to the negotiation of those contracts; and (3) if Pride had known about Bragg's opinion, it would have taken actions to expressly nullify such an interpretation. We hold that, in this context, these reasons are insufficient to raise an opinion to the level of a material disclosure.

First, Bragg did not fail to disclose factual information not otherwise available to Pride. On the contrary, Pride drafted the disputed employment contract in consultation with legal counsel. Moreover, Pride's directors knew that conflicting views concerning the interpretation of section 3.03 existed because former directors and employees had unsuccessfully pursued claims based on the same understanding of the contract during Bragg's tenure with the company. Bragg's opinion, therefore, would not have provided new information to the Board and would not have assisted the Board in its decision-making duties.

Pride contends that Bragg's opinion is material because if it had known about Bragg's opinion, it would have taken corrective action. Pride, however, did not take any corrective action when former president O'Leary advanced a claim consistent with Bragg's opinion. Bragg's opinion thus was not material to the Board or the shareholders in its decision-making process, as it already had the opinion of another high-ranking officer that the employment agreement was ambiguous.

Pride further contends that Bragg made false representations to the shareholders when he signed proxy statements that were inconsistent with his true opinion regarding section 3.03. When confronted with the former directors' claims, Pride maintained its belief that section 3.03 did not provide compensation for terminated employees beyond that expressed in section 3.05. Bragg adopted proxy statements on behalf of Pride that reflected Pride's position in regard to its employment agreements. He was not required to provide the shareholders with speculative information based upon his personal opinion about the contract's interpretation when Pride already had determined that this was an incorrect interpretation. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 372 (Del.1993) (affirming trial court's finding that there was no need to disclose share value which target director initially deemed acceptable, without consulting investment advisors, because non-disclosure was "plainly not material"); *see also In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1070–75 (Del.Ch.2001) (dismissing disclosure claims because alleged misrepresentations were immaterial); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 735–36 (Del.Ch.1999) (granting motion to dismiss because alleged omission or misrepresentation did not meet materiality test).

Second, Bragg had no duty to disclose his private views as to the interpretation of the agreement in the context of negotiating and renewing his own employment. In such a context, a corporate officer acts in his individual capacity, as it is evident that the company and the employee are adverse to each other in the context of negotiating that employee's compensation. *See In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 49–51 (Del. 2006) (holding president did not breach his fiduciary duty when he negotiated and accepted severance provisions of employment agreement or when he accepted a full payout upon termination).

Because the shareholders and directors had prior knowledge that conflicting views existed regarding its employment agreement and chose not to take corrective action, Bragg's opinion would not have "significantly altered the 'total mix' of information." *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. We thus hold that Bragg's opinion was not material. Bragg therefore did not breach his fiduciary duty by failing to disclose it.

### Conclusion

We conclude that the employment agreement in dispute is not ambiguous as to the severance the company owes upon firing its chief executive, and that Bragg has failed to raise a fact issue as to his claim that Pride breached the agreement. We further conclude that Pride has raised no issue of fact under Delaware law that Bragg materially breached his fiduciary duty to the company. We therefore affirm the judgment of the trial court.