**Opinion issued January 15, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00711-CV

————————————

## RONALD E. INGALLS, AS TRUSTEE OF THE ADVENT NETWORKS, INC. BANKRUPTCY ESTATE AND ON BEHALF OF ADVENT NETWORKS, INC., Appellant

## V.

## SOUTHERN UNION COMPANY D/B/A SOUTHERN UNION TECHNOLOGY PARTNERS, L.P., TOM KARAM, AND JOHN E. BRENNAN, Appellees

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-06063**

---

## MEMORANDUM OPINION

Plaintiff-appellant Ronald E. Ingalls, as trustee of the Advent Networks, Inc.

Bankruptcy Estate and on behalf of Advent Networks, Inc., sued defendants-

appellees Southern Union Company d/b/a Southern Union Technology Partners, L.P., Tom Karam, and John E. Brennan (collectively, "Southern Union defendants"). The trial court granted summary judgment in favor of the Southern Union defendants. We affirm.

## BACKGROUND

Advent was a telecommunications equipment provider formed in 1999 that developed, manufactured, and sold a patented networking platform to cable operators and distributors. Those customers in turn use Advent's product to provide subscribers with high-bandwidth commercial service.

Southern Union was an investor in Advent from Advent's 1999 inception until Advent filed for bankruptcy in 2005. Southern Union owned 14% of Advent's stock and was also one of Advent's creditors. Two of Southern Union's employees, Tom Karam and John E. Brennan, served on Advent's seven-member board of directors.

## A.    Plaintiff's Claims

Ingalls's petition alleged that Southern Union "owned a large enough interest in Advent to exercise *de facto* control over key parts of its business." Ingalls complained that the Southern Union defendants used that control to kill potential venture capital financing that could have saved Advent from insolvency in 2005. As described by Ingalls's petition:

Although Advent generated revenue of approximately $1.5 million in 2004, its operations were still largely supported by outside venture capital and institutional investment. . . . Advent raised over $24 million in equity and over $22 million in debt through convertible promissory notes issued in 2002 through 2005. In 2004, Advent began negotiations with a syndicate of venture investors to raise another round of equity financing. This round was intended to fund operations for approximately 18 months until Advent's sales would support operations. Specifically, in late 2004, Advent had a firm proposal from Gefinor Ventures to finance Advent's Series D round of financing to the tune of $7,000,000.00. That round was essential for obtaining working capital and building out inventory for Advent to continue selling products.

After initially supporting the Gefinor proposal, Brennan advised of Southern Union's intention to prevent the Gefinor financing from occurring, to the detriment of Advent. During the Board's crucial vote on the issue on January 31, 2005, and in the face of otherwise unanimous support from the rest the Board, Brennan and Karam voted against the Gefinor financing proposal in the sole interest of Southern Union and to the detriment of Advent. Thereafter, they acted on Southern Union's behalf to ensure that the financing would fail by refusing to agree to Gefinor's proposed terms, explaining to the Board that approval would result in Southern Union owning a greater interest in Advent (at no additional cost to Southern Union, though) and, thus, it would have to publically report its investment in Advent, which it did not want to do.

The Gefinor financing did not occur as a result of Southern Union's *de facto* control and, as a result, Advent did not have the funds to acquire the necessary inventory to meet orders that had been placed for its products. As a result, Advent was forced to seek protection under Chapter 11.

Ingalls's petition alleged that Karam and Brennan owed a fiduciary duty of loyalty to act in the best interest of Advent by virtue of their position as directors of Advent. Ingalls's petition also alleged that, "as the controlling shareholder of

3

Advent, Southern Union owed Advent a duty of loyalty and of due care."[1] Ingalls made claims against each Southern Union defendant, alleging that they "breached their fiduciary duties to [Advent] by exercising bad faith and killing Advent's Gefinor financing with the full knowledge of the harm to Advent," and that the breach "resulted in injury to Plaintiff and benefit to Defendants." As a result, Ingalls sought actual damages of at least $7,000,000 and exemplary damages.

## B. Southern Union Company's Motion for Summary Judgment

Southern Union filed a traditional motion for summary judgment, arguing that, "[a]s a matter of law, Southern Union was not a controlling shareholder of Advent and thus did not have a fiduciary duty to Advent." Alternatively, Southern Union argued that summary judgment was appropriate because, even if Southern Union were considered a controlling shareholder of Advent, as a matter of law it had no duty to forgo contractual rights it was afforded as a preferred shareholder and noteholder, as it would have been required to do if the Gefinor deal had been accepted.

## C. John Brennan's and Tom Karam's Motions for Summary Judgment

Brennan and Karam also filed a traditional motion for summary judgment, arguing that "the undisputed facts establish that neither Brennan nor Karam took

---

[1] Although Ingalls pleaded that Southern Union owed a duty of due care, his allegations and arguments focus only on alleged breaches of the duty of loyalty.

any action that caused damages to Advent." They also contended that Ingalls's real argument is that the tentative financing proposal fell through because Southern Union refused to support the restructuring, not because of something Brennan or Karam did. They assert that, as a matter of law, they are not vicariously liable for Southern Union's actions.[2]

## D.   The Trial Court's Judgment

The trial court granted summary judgment in favor of all the Southern Union defendants without specifying the grounds. Ingalls appealed, arguing in a single issue that the "trial court erred by granting Appellees' motions for summary judgment."

## STANDARD OF REVIEW

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

---

[2]   Brennan and Karam also filed a no-evidence motion for summary judgment, arguing that there was no evidence that (1) either of them received a personal benefit through the actions Ingalls's petition complains of, or (2) either of them failed to act in good faith.

5

In a traditional summary judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).  A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

## SOUTHERN UNION

Southern Union argues that summary judgment in its favor on Ingalls's breach-of-fiduciary-duty claim was proper because (1) "Southern Union did not owe any fiduciary duty to Advent as a matter of law because it was not a controlling shareholder, where Southern Union held only 14% of the stock in Advent and only two seats on the seven-member Advent board,"[3] and (2) "Southern Union was entitled to act in its own self-interest regardless of whether it was a controlling shareholder, where Southern Union, acting as a creditor of

---

[3]  Relatedly, Southern Union notes that Delaware law focuses on control of the *board* rather than control over some aspect of a transaction when assessing control.  Given our disposition of this appeal, we need not, and do not, opine about whether—and under what circumstances—a minority shareholder can be considered controlling without control over the company's board of directors.

Advent, relied on contractual provisions to refuse the modification of existing financial agreements."

## A.     Applicable Law

The parties agree that, under the internal affairs doctrine, Delaware law as the state of Advent's incorporation governs this dispute. *See* TEX. BUS. ORG. CODE ANN. § 1.102 (West 2012); *see also Pride Int'l., Inc. v. Bragg*, 259 S.W.3d 839, 848 n.2 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("[R]ights and duties of directors and stockholders in corporate matters are governed by the laws of the state of incorporation."). And they agree that a shareholder owes a fiduciary duty if (1) it owns a majority of the company's shares, or (2) exercises control over the business affairs of the corporation. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987).

## B.     The Summary Judgment Evidence

Southern Union's summary-judgment evidence reflects that Advent sought financing from Gefinor Venture Partners as it ran out of capital. As Advent acknowledged in its pleadings, Southern Union initially supported Advent's seeking funds from Gefinor. Indeed, minutes from Advent's November 2004 Board of Directors meeting reflect that Gefinor and Southern Union were actively negotiating to reach mutually acceptable terms.

Gefinor's proposal provided for Gefinor to invest $2,000,000 in exchange for Series D stock and for existing or new investors to contribute $5,000,000 in additional capital in exchange for Series D stock. Southern Union had previously secured Advent's $4,000,000 line of credit with a certificate of deposit. Gefinor's proposal required Southern Union to pay $2,000,000 to retire half of that debt in return for Series C-1 stock. The remaining $2,000,000 credit line balance would be retired with funds from other investors. Southern Union would also receive some liquidity preference in the event the company was liquidated.

Southern Union's summary judgment evidence also established that, under Gefinor's proposal, the Series D stock received by Gefinor and other investors would be superior to the Series C-1 stock Southern Union would receive. Gefinor also requested that all convertible debt holders, including Southern Union, be asked to waive the right to interest payments and warrants that were provided by their financing agreements. Finally, the Gefinor transaction would require that funds be allocated in a manner that essentially wiped out the value of some of the company's founders' existing shares.[4]

On January 31, 2005, Advent's board voted on whether to sign Gefinor's term sheet containing these proposals. A majority of the board approved signing the term sheet and continuing with the negotiations. Jack Brennan voted against

---

[4] It is not clear from the record how this allocation would impact Southern Union, if at all.

8

the proposal. Brennan voted Tom Karam's proxy the same way, resulting in a 7-5 vote by the board. At the same meeting, Brennan notified other members of the board that Southern Union would not be agreeing to terms required by Gefinor.

In response to Southern Union's traditional motion for summary judgment, Ingalls proffered summary-judgment evidence about the control Southern Union had over parts of Advent, including a requirement that Advent obtain Southern Union's consent before pursuing certain ventures. Advent's CEO, Edward Perry, testified in his deposition that although Southern Union's representatives did not make up a majority of Advent's board members, he felt that Brennan had significant control over decisions given Southern Union's role as an investor. The specific areas over which Perry testified that Southern Union exerted control were leadership, sales, and financial. Perry testified to his understanding that Southern Union had decided not to support Gefinor's proposal if it required conversion of debt to stock because Southern Union did not want to push its ownership percentage in Advent to a higher level, which in turn would trigger certain public disclosures. Finally, Perry testified that shareholders vote in blocks among the share classes, meaning that Southern Union could have blocked the Gefinor deal if it had gone to a shareholder vote.

Dennis Murphree, another Advent board member, testified that a Southern Union representative told him that Gefinor's low valuation of Advent made

accepting the Gefinor financing proposal unacceptable because it would require Southern Union to write off the difference between the $82 million prior valuation of Advent and Gefinor's current $10 million valuation, which would result in a stock market hit to Southern Union.

Finally, Advent proffered an expert affidavit opining that accepting terms of the Gefinor deal would have been more economically advantageous to Southern Union than letting Advent go bankrupt.

## C.    Analysis

It is undisputed that Southern Union did not own a majority of Advent's stock or control a majority of Advent's board. It is also undisputed that Southern Union possessed certain contract rights that it would be required to give up under the Gefinor deal, and that the Gefinor deal required Southern Union to convert some existing debt to stock, which Southern Union did not want to do.

Ingalls argued, in his appellant's brief, that "sufficient evidence was presented to show that Southern Union acted as a controlling shareholder and note-holder of [Advent], thus giving rise to fiduciary duties." Stated differently, Ingalls's position is that Southern Union's rights, which it possessed as a noteholder, gave it control over Advent such that Southern Union should be treated as a controlling shareholder even though it owned less than a majority of the company's stock. In response, Southern Union argued that "Delaware law is clear

that contract rights, regardless of how much 'control' they impart, do not make the holder of such rights a controlling shareholder, and do not impose fiduciary duties." Moreover, Southern Union contended Ingalls's brief wholly ignored one of Southern Union's summary-judgment grounds, i.e., that even if Southern Union were deemed to be a controlling shareholder, "Delaware law recognizes that controlling shareholders may act in their own self-interest." In his reply brief, Ingalls acknowledges that "controlling shareholders are not required to act altruistically towards minority shareholders, or to their own financial detriment," but argues that this rule is inapplicable because "[n]othing about the Gefinor proposal would have placed Southern Union in a worse-off financial stance."

We agree with Southern Union that, even if it were a controlling shareholder, its refusing to forgo contract rights and refusing to convert debt to stock as required by the Gefinor deal would not amount to a breach of fiduciary duty as a matter of law. Accordingly, the trial court properly granted summary judgment in Southern Union's favor.

Delaware law does not "require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders." *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986). In *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, the

11

Delaware Chancery Court recognized that controlling shareholders do not have a duty of self-sacrifice:

> Fleming's refusal to waive its preemptive rights or to assume further financial obligations on behalf of ABCO without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties. As Chancellor Allen observed in *Thorpe v. CERBCO*, Del. Ch., C.A. No., Allen, C., 1993 WL 443406, *7, mem. op. at 14 (Oct. 29, 1993), "controlling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them."

735 A.2d 386, 411 (Del. Ch. 1999); *S. Muojo & Co. LLC v. Hallmark Entm't Invs. Co.*, No. 4729-CC, 2011 WL 863007, at *11 (Del. Ch. 2011) (holding that debt holder and majority stockholder "did not have any legal obligation to continue to waive Crown's debt obligations, . . . defer payments or to make other financial concessions for the sake of Crown, or its minority stockholders.").

The only response Ingalls offers is the assertion that Southern Union's accepting the Gefinor deal would not be detrimental to Southern Union financially. In support, he cites Advent's own expert's conclusion that agreeing to the Gefinor deal would have been a better economic choice for Southern Union. Ingalls, however, does not cite any authority for our engaging in such analysis. Given that the parties do not dispute that Southern Union relied on its existing contractual rights in refusing to accept concessions required by the Genfinor deal, the inquiry ends. Because Southern Union's refusing to forego contractual rights does not, as

a matter of law, amount to a breach of fiduciary duty under Delaware law, the trial court properly granted summary judgment in Southern Union's favor.

## BRENNAN AND KARAM

Brennan and Karam argue that summary judgment was appropriate because, as a matter of law, nothing Brennan or Karam did caused injury to Advent. Ingalls responds that Brennan and Karam voted to benefit Southern Union rather than Advent, which is a breach of their duty of loyalty. He further contends that Delaware courts "loosen normally stringent requirements of causation and damages" when a breach of loyalty is at issue. *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

Directors are required to hold "an undivided and unselfish loyalty to the corporation" and be free from "conflict between duty and self-interest." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Id*.

As he did in the trial court, Ingalls focuses here on the evidence he contends establishes that Brennan and Karam were beholden to Southern Union and, thus, had divided loyalties. We agree with Brennan and Karam, however, that Ingalls has failed to articulate any action by Brennan or Karam that impacted, much less

13

harmed, Advent. Ingalls's real complaint is that Southern Union refused to agree to Gefinor's terms for providing Advent additional financing. At the board level, Brennan and Karam did vote against continued negotiation with Gefinor—a vote aligned with Southern Union's plans to reject the deal. But Brennan and Karam were outvoted at the board level, and the majority of the board voted to continue forward with negotiations. It was Southern Union, in its capacity as a creditor, that had the ultimate power to accept or reject Gefinor's terms. Ingalls has not articulated any other action by Brennan and Karam that allegedly harmed Advent. The trial court, thus, correctly granted summary judgment in Brennan's and Karam's favor.

## CONCLUSION

We overrule Ingalls's sole issue and affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

14